CENTRAL MAINE POWER COMPANY

v.

WATERVILLE URBAN RENEWAL AUTHORITY.

Supreme Judicial Court of Maine.

Sept. 9, 1971.

Weeks, Hutchins, Frye & Welch, by Bradford H. Hutchins, Waterville, William M. Finn, Augusta, for Central Maine Power Co.

Jolovitz & Niehoff, by Lester Jolovitz, William P. Niehoff, Waterville, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY and WERNICK, JJ.

DUFRESNE, Chief Justice.

The instant case is before us on report. This Court is asked to render such decision as the rights of the parties require based upon the complaint, answer, an agreed statement of facts and on so much of the evidence presented to the Court below, including testimony and exhibits, as is legally admissible. 4 M.R.S.A. § 57, M.R.C.P., Rule 72(a), (b).

The defendant, Waterville Urban Renewal Authority, hereinafter termed the Authority, under the provisions of 30 M. R.S.A. §§ 4801 et seq., recommended for approval to the municipal officers of the City of Waterville the Urban Renewal Plan for the Charles Street Urban Renewal Project. By resolution duly enacted the reference plan was approved by the municipal authorities on February 5, 1963. In turn, the Authority duly and lawfully adopted it by formal resolution of February 26, 1963. In accordance with the terms of the plan and project, the City of Waterville discontinued certain public streets and ways in the urban renewal project area and established a new public street or way therein known as Appleton Street Extension. Parking areas and access ways were also established. All these public streets, ways, parking areas and access ways have or will eventually become the property of the City of Waterville for such purposes. On September 20, 1966 the Authority, pursuant to the approved plan, requested the plaintiff, Central Maine Power Company, hereinafter termed Central Maine Power or the utility, to remove all overhead poles and wires in the urban renewal area (excepting certain designated ones not here pertinent), "necessary replacements for such removals

to be installed underground." To implement its request, the Authority entered into a contract with Central Maine Power whereby the latter agreed to make all proper underground installations for the necessary transmission of electric energy to comply with the projected underground distribution system to and across the urban renewal area and the Authority promised to pay to the company the excess cost which the installation of the underground system would entail over and above the cost of supplying the same service with aboveground poles and wires. The Authority's obligation was expressly conditioned, as follows: "provided that under the constitution, common law and statutes of the State of Maine the Company could not be legally compelled to install such cables and wires underground at its own expense." It is stipulated that the additional cost of the underground installations is in the amount of $35,973.97.

The question at issue is: Can Central Maine Power Company be legally required to bear the additional cost incurred by virtue of such underground installations in excess of the cost of an overhead electric system? We answer in the affirmative.

In an analogous situation, our Court has ruled that public service corporations have no right to reimbursement for relocation of their facilities in public ways from a like public authority without express legislative sanction. In The First National Bank of Boston v. Maine Turnpike Authority, to be referred to hereinafter as Maine Turnpike Authority, 1957, 153 Me. 131, at pages 159, 160, 161, 136 A.2d 699, at pages 715, 716, this Court used the following pertinent language:

"The Authority takes its powers immediately from the legislature and the enabling act delegates police power of considered precedence as to utility facilities located in public streets or ways in its route.

Because of the state of the law authoritatively expressed, without an af-

firmative grant from the legislature, the defendant utilities when submitting to the police power had no right to reimbursement for relocation of their facilities installed in the public ways or for abandonment of them. Conversely the Authority had no right to reimburse the utilities without such legislative sanction.

\*     \*     \*     \*     \*     \*

The enabling act does not in the very words state that the Authority may or must pay the relocation costs in dispute here. Nor does the act imply that those costs may or must be so paid. The description and enumeration of costs and properties fall short of containment of payments for expense arising from damages without the invasion of legal right. The rights of utilities to enjoy installations in public streets or ways are positive and very respectable in the status of the law but they are subordinate to public travel and to the valid exercise of the police power. They have, as we have seen, supra, their delimitations. *The terms, 'real property' 'interest or interests therein,' 'land,' 'rights,' 'easements' and 'franchises' as used in the enabling act prior to its last amendment [not pertinent here] are not sufficiently apt to support the claim of the defendant utilities."* [Emphasis added.]

It is undisputed that, prior to the approval and adoption of the Urban Renewal Plan by the municipal government of Waterville and the Authority in February, 1963, Central Maine Power had been permitted to install and maintain aboveground in the public streets of the urban renewal area its facilities for the transmission of light and power by electricity. Such installations had statutory validation, 35 M. R.S.A. § 2348, and we need not consider whether they otherwise derived legal legitimacy from charter power or other specific legislative authorization. In 1963, permits to place wires and cables and all conduits and other structures for conducting and maintaining such wires and cables

"under the surface of those streets and highways in which such companies are empowered to obtain locations for their \* \* \* appurtenances, poles and wires, \* \* \* subject to such rules and regulations as to location and construction as such municipal officers may designate in their permit," were available under 35 M.R.S.A. § 2347. Such permits are subject to the condition that "[e]very such corporation shall so construct and maintain its poles, lines, fixtures and appliances in, along, over, under and across the roads and streets in which it may obtain locations \* \* \* and along its route or routes, as not to incommode the use of such roads and streets for public travel \* \* \*." 35 M.R.S.A. § 2355.

In Maine Turnpike Authority, it was further stated (153 Me. 131 at page 151, 136 A.2d at page 711):

"Charters, franchises, statutory grants and permits affording the use of public ways to utility locations are subservient, expressly or by implication, in the exercise of governmental functions, to public travel and to the paramount police power and relocation of utility facilities in public streets or ways are at utility expense, a common law liability unless abrogated by the clear import of the language used in a particular instance."

\*     \*     \*     \*     \*     \*

(at page 152, 136 A.2d at page 711)

"Without express authority from the legislature the state or municipality cannot pay a utility its expense for relocating an installation in a public street or way."

\*     \*     \*     \*     \*     \*

"When to accomplish a legitimate, public, protective purpose by a reasonable and not arbitrary regulation, not violative of any constitutional limitation the state invokes the police power obliging utilities to relocate their facilities installed in a public street or way, without compensation, there is no taking of private property but damnum absque

injuria, damage without the invasion of legal right."

The Waterville Urban Renewal Authority was created under 30 M.R.S.A. § 4802, by the municipality of Waterville under legislative authorization after the municipal officers adopted a resolution finding that:

"A. One or more slums or blighted areas exist in such municipality; and

B. The rehabilitation, conservation, redevelopment, or a combination thereof, of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents of such municipality."

The enabling legislation, 30 M.R.S.A. § 4804, empowers the Authority to

"exercise public and essential governmental functions"

and endows it with

"all the powers necessary to carry out and effectuate the purposes and provisions of this subchapter, including the following powers

\* \* \* \* \* \*

2. To undertake and carry out urban renewal plans and urban renewal projects \* \* \*."

" 'Urban renewal project' [under 30 M.R.S.A. § 4801(13)] may include undertakings and activities of the authority in an urban renewal area for the elimination, and for the prevention of the development or spread, of slums and blight, and may involve slum clearance and redevelopment in an urban renewal area, or rehabilitation or conservation in an urban renewal area, or any combination or part thereof in accordance with an urban renewal plan. Such undertaking and activities may include:

\* \* \* \* \* \*

C. Installation, construction or reconstruction of streets, utilities, parks, playgrounds and other improvements necessary for carrying out in the urban renewal area the urban renewal objectives of this subchapter in accordance with the urban renewal plan; \* \* \* "

In 30 M.R.S.A. § 4806 the Authority's right to acquire real property is made subject to the approval of its proposed renewal plan through proper "resolution" of the municipal officers of the municipality. Its specific urban renewal plan as recommended to the municipal officers must be a congruent part of a master plan for the development of the community already prepared "in substance."

"2. *Urban renewal plan.* The authority may itself prepare or cause to be prepared an urban renewal plan, or any person or agency, public or private, may submit such a plan to the authority. *An urban renewal plan shall be sufficiently complete to indicate its relationship to definite local objectives as to* appropriate land uses, improved traffic, public transportation, *public utilities,* recreational and community *facilities and other public improvements* and the proposed land uses and building requirements in the urban renewal area, and shall include without being limited to:

\* \* \* \* \* \*

D. A statement of the proposed changes, if any, in zoning ordinances or maps, *street layouts,* street levels or grades, building codes and ordinances;

\* \* \* \* \* \*

F. A statement as to *the kind* and number *of* additional *public* facilities or *utilities* which will be required to support the new land uses in the area after redevelopment." [Emphasis added.]

The right of eminent domain was granted the Authority in the following broad terms:

30 M.R.S.A. § 4807. Eminent domain

"The authority shall have the right to acquire all or any part of the real property, or any interest therein, within the

renewal project area by the exercise of the power of eminent domain, whenever it shall be judged by the authority that the acquisition of said real property, or the interest therein, is in the public interest or necessary for the public use.

The necessity for such acquisition shall be conclusively presumed upon the adoption by the authority of a resolution declaring that the acquisition of the real property, or interest therein, described in such resolution is in the public interest and necessary for the public use and that such real property, or interest therein, is included in an approved urban renewal project under this subchapter."

It cannot be disputed, and the plaintiff agrees, that the Authority was vested with the police power of the State for the purpose of removing slums or blighted areas and for the rehabilitation, conservation, redevelopment of said areas or a combination thereof, as may be necessary in the interest of the public health, safety, morals or welfare of the residents of the municipality, subject, however, in the implementation of its proposed activities and in the exercise of said police power, to prior approval of its renewal plans by the municipal officers under proper governmental resolution.

The parties agree that the Urban Renewal Plan for the Charles Street Urban Renewal Project was lawfully adopted and all statutory requirements satisfied. Central Maine Power Company questions the right of the Authority in the exercise of the police power to compel it to go underground with its facilities in the distribution of light and electric power without compensation for the cost of installation in excess of that which an aboveground system would involve. It is manifest, however, from the legislative grant of powers as hereinbefore enumerated, the defendant Urban Renewal Authority, for the purpose of carrying out the legislative design, was endowed with the police power of the State in an equal degree, if not in broader scope,

as the Maine Turnpike Authority was empowered in the planning and construction of the Maine Turnpike.

As in the *Maine Turnpike Authority* case, the enabling legislation does not in its very terminology state that Urban Renewal Authorities may or must pay the relocation costs, *aboveground or underground*. Neither can we find any implication therein that those costs may or must be so paid. Furthermore, at the time of the enactment of the law creating municipal urban renewal authorities in 1959, the Legislature must be presumed to have known of the judicial interpretation by this Court of the legislation relating to the Maine Turnpike Authority law. Our Court in 1957 had ruled that without the 1955 amendment wherein the Legislature expressly authorized the Maine Turnpike Authority to pay the public utility the cost of relocations, the general rule was that

*"without an affirmative grant from the legislature,* the defendant utilities when submitting to the police power had no right to reimbursement for relocation of their facilities installed in the public ways or for abandonment of them. Conversely the Authority had no right to reimburse the utilities without such legislative sanction."  (Emphasis added.)

We must presume that the Legislature acted with full knowledge of the common law restrictions upon public utilities as said limitations had already been judicially declared by this Court shortly prior to the enactment of the Urban Renewal Authority law. See, Blier v. Inhabitants of Town of Fort Kent, 1971, Me., 273 A.2d 732.

Plaintiff argues that the failure to obtain the approval of the Public Utilities Commission in the matter of underground relocation justifies compensation for the excess cost. 30 M.R.S.A. § 4807(2) does provide that

"no real property, or interest therein, belonging to a public utility corporation may be acquired without the approval of

the Public Utilities Commission or other officer or tribunal having regulatory power over such corporation."

The terms "real property" and "interest therein," as used in the enabling act, are not sufficiently apt to describe the license or permit enjoyed by public utilities in maintaining their installations in public streets or ways. When the defendant Authority, with the approval of the municipal authorities, requested the plaintiff utility to relocate its facilities underground in the urban renewal area, there was no taking or invasion of a legal right, property or interest therein within a fair intendment of 30 M.R.S.A. § 4807(2). See, *Maine Turnpike Authority,* supra.

Electric companies operate for private gain and even though the installation and maintenance of their lines are affected with a public use, they occupy and use the soil of our public roads and highways by permission of the municipal officers under legislative enabling acts. The location of their posts, cables, wires and suitable accessory appliances has been left for determination, in the first instance, to the wise discretion of the municipal authorities to be exercised with a view to existing and probable future conditons. See, Readfield Telephone and Telegraph Company v. Cyr, 1901, 95 Me. 287, 49 A. 1047; 35 M.R.S.A. §§ 2344, 2346, 2347, 2482 and 2489. The defendant Urban Renewal Authority was created for the specific purpose of planning and effectuating the removal of slum or blighted areas in the City of Waterville with the duty to redevelop the renewal area. In so doing it was charged with the assessment of the needs required to bring about a new setting of the local municipal area with a view for a coordinated and comprehensive pattern conducive to attainment of appropriate local objectives in all aspects of municipal improvement.

We do recognize that the municipal officers of Waterville, a city with a population under 40,000 inhabitants, were not expressly empowered under 35 M.R.S.A.

§ 2482 to revoke the location of poles of electric companies and order their removal upon the grant of other suitable locations or of the right to the joint use of poles of other companies as provided by Section 2489 for cities with a population in excess of that number. Nevertheless, Section 2482 does give the municipal officers the power to direct or approve any alteration from an original permit, after the lines of the electric companies have been erected upon notice and opportunity to be heard. It would serve no useful purpose to delimit and compare the extent of the legislative power granted by the two sections. We stated in *Maine Turnpike Authority,* at pages 140 and 141 of volume 153 of the Maine reports (136 A.2d 699 at page 705):

"The merits of the present controversy, however, concern themselves primarily with the requirements of public travel and with the police power. The authorities which follow as well as the Maine decisions which precede establish that, whatever hierarchy of privileges in utility installations there may be, the exigencies of public travel and the police power are unremittingly paramount."

Again, at page 151 of volume 153 of the Maine reports (136 A.2d 699 at page 711), we read:

"Charters, franchises, statutory grants and permits affording the use of public ways to utility locations are subservient, expressly or by implication, in the exercise of governmental functions, to public travel and to the paramount police power and relocation of utility facilities in public streets or ways are at utility expense, a common law liability unless abrogated by the clear import of the language used in a particular instance."

■ It is within the exclusive jurisdiction of the Legislature to lodge control of the roads of the State in the municipalities and to prescribe rules as to the exercise of such control. Larson v. New England Telephone & Telegraph Co., 1945, 141 Me. 326, at page 331, 44 A.2d 1, at page 4. It is

equally within the exclusive power of the Legislature to modify such municipal control to the extent of empowering urban renewal authorities and municipal officers, in carrying out their governmental function of municipal rehabilitation, conservation and redevelopment, to propose, approve and adopt urban renewal plans calling, amongst other things, for changes in the layout of streets in the renewal area. 30 M.R.S.A. § 4806 (2) (F) requires that the urban renewal plan include a statement as to the kind and number of additional public facilities or utilities which will be required to support the new land uses in the area after redevelopment. The plan must also indicate the appropriate land uses to be permitted in the area, its relationship to improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements. In the sphere of urban renewal planning and redevelopment, the Legislature has clothed Urban Renewal Authorities in cooperation with the municipal officers of the areas involved with the police power wherever necessary to carry out and effectuate the purposes and provisions of municipal rehabilitation, conservation and redevelopment.

◼ In such matters of urban renewal and rehabilitation the defendant Authority was acting on behalf of the State within the scope of its corporate functions and, in requesting underground installations of public utility facilities in the urban renewal area, provided the urban renewal plan received approval of the municipal officers through proper governmental resolution, it was exercising the police power of the State which it obviously possessed. The State's duty and consequent power of providing for the public health, safety, morals and welfare of the residents of Waterville through the defendant Urban Renewal Authority override all statutory privileges of public utilities. Though the rights of public utilities in the usage of our public ways are "of a very respectable and respected or-

der" and cannot be taken away in an arbitrary manner and without reasonable cause, they are otherwise subservient to validly exercised police power. Brunswick & Topsham Water District v. Hinman Co., 1957, 153 Me. 173, 136 A.2d 722.

Plaintiff cites Central Hudson Gas & Electric Corp. v. Kingston Urban Renewal Agency, 1968, 31 A.D.2d 708, 296 N.Y. S.2d 113 as holding a contrary position. We do not subscribe to the ruling in that case in view of the forceful reasoning of the *Maine Turnpike Authority* case.

The plaintiff further cites the cases of Cincinnati and Suburban Bell Telephone Co. v. City of Cincinnati, 1964, 7 Ohio Misc. 159, 215 N.E.2d 631 and State ex rel. Rocky Mountain Bell Telephone Co. v. Mayor, Etc., of City of Red Lodge, 1904, 30 Mont. 338, 76 P. 758, in support of its position, but in both cases no urban renewal project is involved and the respective Courts did not have to deal with the conjoined exercise of the police power by an urban renewal authority and the municipal officers of the municipality. The Massachusetts Court reached a different result than did the Ohio and Montana Courts under similar legislative regulations of street locations of public utility facilities in Boston Edison Company v. Board of Selectmen of Concord, 1968, 355 Mass. 79, 242 N.E.2d 868.

It is true that in *Maine Turnpike Authority* there is no suggestion that underground installation was a factor in relocation of the utilities' facilities. Nowhere in the opinion does the Court address itself to this specific issue. Nevertheless, we believe that in the circumstances of the instant case, the common law rule expounded in *Main Turnpike Authority* would apply. We recognize that the Authority's directive to the plaintiff public utility to replace its removed facilities by underground installations was in the form of a request. This euphemistic approach by the Authority to the redevelopment problem could only be viewed by the plain-

tiff public utility as notice to it that all requests for aboveground relocation permits in the urban renewal area would be rejected. Central Maine Power was thus placed in the position of choosing a course of action. Either it could elect to submit to the police power as exercised by the defendant Authority, or, if it thought the financial impact of servicing its customers by an underground system potentially disastrous, it could refuse to furnish the service until so ordered by the Public Utilities Commission, the statutory agency specially assigned to determine the "economic feasibility" of any particular service. See, 35 M.R.S.A. §§ 212, 291, 294, 296. Indeed, we said in Dickinson v. Maine Public Service Co., 1968, Me., 244 A.2d 549, at page 555:

"If Maine Public exhausts all legal means of obtaining locations on public or private property without success, it can then seek to be relieved by the Commission from the obligation to render such service as is thereby affected."

The conditional obligation of the parties was couched as stated previously in the following language, "provided that under the constitution, common law and statutes of the State of Maine the *Company could not be legally compelled* to install such cables and wires underground at its own expense." (Emphasis supplied.) The contract is somewhat ambiguous. Could the parties have meant "legally compelled to install such cables and wires underground at its own expense" *by anyone?* Hardly so, since it is clear that the Public Utilities Commission could so order. Construing this contract provision in the light of all the existing circumstances, we believe the parties used the reference conditional phrase as meaning, provided that the Company could not legally be denied permission by the defendant Authority to install its cables and wires aboveground. The Waterville Urban Renewal Authority had the police power veto respecting aboveground installation by Central Maine Power Company of its facilities in the urban renewal

area, and when the utility chose submissively to relocate its facilities underground to service its customers, then it did so without right of compensation, provided the Authority's vetoing action was reasonable and not arbitrary.

Plaintiff advances in support of the alleged illegality of the defendant's request for it to go underground with its facilities the fact that the urban renewal plan was approved by resolution of the municipal officers and not by ordinance. In the instant case the pertinent statute, 30 M.R.S.A. § 4806(7), prescribes that the municipal officers may approve the renewal plan by resolution; by such express legislative direction, municipal action even in the area of the exercise of the police power, taken by resolution and not by ordinance, is procedurally proper and legal. See, Burke v. Board of Representatives of Stamford, 1961, 148 Conn. 33, 166 A.2d 849; 62 C.J.S. Municipal Corporations § 160; 37 Am.Jur., Municipal Corporations, § 52.

We do not intimate what our decision would be if no urban renewal authority and no urban redevelopment program were involved, but restrict our ruling to the facts of this case.

The ultimate issue remains, was the virtual mandate to go underground with the plaintiff's facilities a reasonable exercise of the police power or an arbitrary display of bureaucratic authority?

The case is on report and expert testimony has been submitted to this Court for our consideration in resolving this issue. Initially, we must bear in mind that the burden is on the plaintiff public utility to prove its entitlement to compensation by demonstrating that the Authority's request to provide underground installation of its electrical facilities in carrying out the urban renewal plan with the deliberate approval of the municipal officers of the City of Waterville was an arbitrary exercise of the police power of the State and for that reason comes within the exception

which this Court recognized in the *Maine Turnpike Authority* case.

■ The burden of proof as distinguished from the burden of going forward with the evidence rests upon the plaintiff utility. It must support its right to recover by the fair preponderance of the evidence. It must persuade the finder of the facts that its contention is right. Otherwise, its cause is lost. Cox v. Metropolitan Life Insurance Company, 1942, 139 Me. 167, 28 A.2d 143; Foss v. McRae, 1909, 105 Me. 140, 73 A. 827. The burden is on the plaintiff Central Maine Power to establish a record sufficient to indicate arbitrary abuse of the police power by the local authorities. See, Boston Edison Company v. Board of Selectmen of Concord, supra.

It is true that the instant case comes to us on report and that the evidence in justification of the original municipal action is submitted to us for consideration in the solution of the issue. We must assume, however, that such evidence in substance was available to the local authorities and was in fact the setting and the reasons for the particular local decision.

Action lacking in reasonableness may be characterized as arbitrary, but when it bears a real and substantial relation to the promotion of the health, safety, morals or welfare of the residents of a municipality with which the local governmental agencies are charged, then such action is within the proper scope of the police power.

The general rule is that—

"Arbitrary and capricious action on the part of an administrative agency has been defined as wilful and unreasoning action, without consideration of facts or circumstances. Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." State ex rel. Cosmopolis Consolidated School District

No. 99, Grays Harbor County v. Bruno, 1963, 61 Wash.2d 461, 378 P.2d 691, 696. See also, Urmston v. City of North College Hill, 1961, 114 Ohio App. 213, 175 N.E.2d 203, 206.

■ Arbitrary or capricious action on the part of an administrative agency occurs when it can be said that such action is unreasonable, has no rational factual basis justifying the conclusion or lacks substantial support in the evidence. Hollon v. Pierce, 1968, 257 Cal.App.2d 468, 64 Cal. Rptr. 808, 815; Olson v. Rothwell, 1965, 28 Wis.2d 233, 137 N.W.2d 86, 89.

■ The party asserting arbitrariness and unreasonableness of action in the exercise by administrative officials of the police power of the State under a statute valid on its face has the burden of establishing the invalidity of the administrative action. Regularity is presumed. All legal intendments are in its favor. Its decision will be assumed to have been taken with full knowledge of material facts and in justification thereof. Milwaukie Company of Jehovah's Witnesses v. Mullen, 1958, 214 Or. 281, 330 P.2d 5, 11.

■ Before characterizing administrative action as arbitrary and capricious, consideration must be given to the scope of the statutory functions delegated by the Legislature to the administrative agency endowed with the police power. In the instant case, the legislative design contemplated coordinated action by the Urban Renewal Authority and the municipal officers of the area of redevelopment with ultimate control resting with the city officials. The defendant Authority was given very broad powers in the sphere of health, safety, morals and general welfare of the residents of the community under redevelopment. Indeed, 30 M.R.S.A. § 4806 (4) provides as follows:

"*4. Whether plan accomplishes certain purposes.* Prior to recommending an urban renewal plan to the municipal of-

ficers for approval, the authority shall consider whether the proposed land uses and building requirements in the renewal project area are designed with the general purpose of accomplishing, in conformity with the master plan, a coordinated, adjusted and harmonious development of said municipality *which will, in accordance with present and future needs, promote health, safety, morals, order, convenience, prosperity and the general welfare, as well as efficiency and economy in the process of development; including,* among other things, *adequate provision for traffic, vehicular parking, the promotion of safety from fire, panic and other dangers,* adequate provision for light and air, the promotion of the healthful and convenient distribution of population, *the provision of adequate* transportation, water, sewerage and *other public utilities,* schools, parks, recreational and community *facilities and other public requirements, the promotion of sound design and arrangement,* the wise and efficient expenditure of public funds, *the prevention of the recurrence of* insanitary or unsafe dwelling accommodations, slums or *conditions of blight,* and the provisions of adequate, safe and sanitary accommodations." (Emphasis added.)

The Legislature delegated to the defendant Authority the duty to prepare and submit for approval to the municipal authorities any urban renewal plan devised under the master plan for the development of the municipality. 30 M.R.S.A. § 4806(2). The Authority in its design of the urban renewal plan and the municipal officers in their approval of it are duty bound under the enabling act to consider the same factors which the Legislature enumerated for the operation of the legislatively created urban renewal program. Legislative emphasis seems to have been placed in broad terms on the removal of blighted areas and the rehabilitation and redevelopment of the same as may be necessary in the interest of public health, safety, morals or welfare of the residents of the municipality. 30

M.R.S.A. § 4802(1) (A) and (1) (B). In more definite details, the Legislature in 30 M.R.S.A. § 4806(4) has spelled out additional factors which may be considered in the overall design and approval of an urban renewal plan such as the promotion of order, convenience and prosperity, efficiency and economy as well as that of the health, safety, morals and general welfare while in the process of development. Redevelopment projects under the enabling act must take into consideration future as well as present needs of the municipality, economic progress as well as new technological advancements in the light of modern industrial concepts, and especially if such factors serve to prevent recurrence of blighted conditions.

The urban renewal project provided for a "down town shopping center" with spacious off-street parking and loading. The urban planner who prepared the renewal plan as well as the master plan for redevelopment of the City of Waterville testified that, in order to promote maximum safety conditions for driving, elimination of as many structures and impediments to travel as possible was a major consideration in the planning of the shopping center. The trend, as he said, fosters the elimination of overhead electrical systems. It was stated that the great number of electric poles was one of the factors which blighted the area. His testimony was supported by Dr. Alexander Kusko, a consulting electrical engineer, who categorically stated that, from the standpoint of safety and reliability, an underground system in the Waterville urban renewal shopping center was desirable and mandatory. He did also state that from the standpoint of appearance or aesthetics, an underground system was preferable since the combination of poles, transformers and conductors make for an unsightly appearance. Plaintiff's witness did not fully agree with the Authority's experts, but did admit that the current leaning throughout the country is in favor of underground systems, especially in urban areas where of necessity utilities must go underground.

**244**

Courts should not interfere with the administrative branch of government upon an important phase of the work for which the Authority in the instant case was set up, especially where the enabling act calls for the approval of the administrative action by the municipal officers of the locality involved, except for fundamental error or arbitrary and capricious conduct. That the urban renewal plan compelling underground installation of electrical facilities may have served two purposes, the safety feature and also an aesthetic setting, will not necessarily taint it with the evil of arbitrariness. The fact that considerations of an aesthetic nature may have entered into the determination to compel underground wiring would not invalidate administrative action otherwise taken "in the interest of the public health, safety, morals or welfare of the residents" of the city of Waterville. York Harbor Village Corporation v. Libby, 1928, 126 Me. 537, 542, 140 A. 382.

Furthermore, evidence that the plaintiff utility had gone underground with its facilities in areas adjacent to the urban renewal area was relevant to support reasonableness of action by the municipal authorities.

In conclusion, we cannot say that the plaintiff has maintained its burden of proof that the Authority and municipal officers of the City of Waterville, in requesting the utility to go underground with its electric facilities in the urban renewal area, was guilty of arbitrary or unreasonable conduct, or that its exercise of the police power of the State in that instance was not primarily purposed upon the promotion of the public health, safety, morals or general welfare of the residents of the city. The rule of *Maine Turnpike Authority* controls and if public utilities want relief from the extra cost of relocation underground instead of aboveground, they should direct their appeal to the Legislature; the only other possible alternative lies in testing the "economic feasibility" of the new manner of service before the Public Utilities Commission.

The entry will be

Judgment for the defendant, Waterville Urban Renewal Authority, without costs.

MARDEN, J., sat at argument but retired before the decision was rendered.