2005 ME 50

**Harold A. KROEGER**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 20, 2004.

Decided: April 7, 2005.

Gregory M. Cunningham, Esq., Joan M. Fortin, Esq. (orally), Bernstein, Shur, Sawyer & Nelson, Portland, for plaintiff.

G. Steven Rowe, Attorney General, Margaret Bensinger, Asst. Atty. Gen. (orally), Augusta, for BEP.

Catherine R. Connors, Esq. (orally), Brian M. Rayback, Esq., Pierce Atwood, Portland, for Charles Butt.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, RUDMAN, CALKINS, and LEVY, JJ.

Dissent: DANA, and ALEXANDER, JJ.

CALKINS, J.

[¶ 1] Harold A. Kroeger appeals from a judgment of the Superior Court (Kennebec County, *Studstrup, J.*) affirming the De-

partment of Environmental Protection's denial of his application to build a dock. The Department denied the permit because it found that the proposed dock did not meet the requirements of the Natural Resources Protection Act, 38 M.R.S.A. §§ 480–A to-Z (2001 & Supp.2004), in two respects: (1) the dock would unreasonably interfere with existing scenic uses, and (2) the dock would unreasonably harm significant marine aquatic habitat. Kroeger challenges the factual findings of the Department, arguing that they are unsupported by the record and arbitrary.[1] We affirm the Department's denial of the permit on the basis that the proposed dock will interfere with existing scenic uses, and we do not reach the issue of unreasonable harm to the marine habitat.

## I. BACKGROUND

[¶ 2] Kroeger owns property on Mount Desert Island with two hundred feet of shorefront on the eastern shore of Somes Sound in the area known as the Narrows. He applied to the Department for a permit to construct a dock. In the application, Kroeger stated that the dock would be used for recreational boating and that its purpose was to access and store dinghies and to access his large boat that is moored nearby. Kroeger's plan describes a 180–foot long dock, consisting of the following: a permanent pier, 110 feet in length by six feet wide; a seasonal ramp, fifty feet long by four feet wide; and a float, twenty feet long by fifteen feet wide.[2] The plan calls for the pier to be supported by a concrete abutment on shore and two granite cribs.

The pier would impact 138 square feet of the coastal wetland substrate.

[¶ 3] During the process of reviewing the application for the permit, the Department received letters from citizens who use Somes Sound and who criticized the proposal. These included comments from a neighboring landowner, who opposed the construction of the dock and who was later granted intervener status in the Superior Court. Kroeger was allowed to supplement his application to respond to the various comments. Before the Department rendered its decision, it issued a draft order and gave Kroeger an opportunity to comment on the draft, which he did.

[¶ 4] In its final order, the Department made detailed factual findings and concluded that Kroeger's application met seven of the nine NRPA standards. 38 M.R.S.A. § 480–D (2001 & Supp.2004). However, because a permit cannot be issued unless an applicant has demonstrated that all nine standards are met and because the Department found that Kroeger failed to meet two of the standards, the Department denied the permit. One of the standards he failed to meet requires that an "activity will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses." 38 M.R.S.A. § 480–D(1) (2001). Regarding this standard, the Department stated that the proposed dock would unreasonably interfere with existing scenic uses because it "would represent a sharp visual contrast to the existing shoreline . . . and the applicant has alternatives that would meet the project purposes making the impacts unnecessary and unreasonable."

1. In his brief to us, Kroeger argues that the NRPA is an unconstitutional delegation of authority to the Department and that the NRPA and the Department regulations are unconstitutionally vague. At argument, Kroeger conceded that he failed to preserve the constitu-

tional issues. For this reason, we do not consider his constitutional challenges.

2. Kroeger's original plan was for a larger dock, but the dimensions given here are from the revised plan upon which the Department based its decision.

[¶ 5] The other standard that the Department found that Kroeger failed to meet is the "harm to habitats" standard, which requires that an activity "not unreasonably harm any significant wildlife habitat, freshwater wetland plant habitat, threatened or endangered plant habitat, aquatic habitat, travel corridor, freshwater, estuarine or marine fisheries or other aquatic life." 38 M.R.S.A. § 480–D(3) (Supp.2001).[3] The Department found that Kroeger's proposed dock "would result in the loss of coastal wetland area, functions and values; would result in a loss of marine aquatic life and habitat; and that the applicant has alternatives that would meet the project purpose making the impacts unnecessary and unreasonable."

[¶ 6] Kroeger appealed the denial of the permit to the Superior Court. The Superior Court affirmed the Department's decision, and Kroeger appealed. The neighbor, who was granted intervener status in the Superior Court pursuant to M.R. Civ. P. 24(b), has also participated in this appeal as an appellee.

## II.  DISCUSSION

### A.  Standard of Review

[¶ 7] When a party appeals a judgment resulting from the Superior Court's review of an administrative agency decision, we review the agency's decision directly. *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 11, 832 A.2d 765, 768. We do not vacate an agency's decision unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or an error of law; or is unsupported by the evidence in the record. 5 M.R.S.A. § 11007(4)(C) (2002).

[¶ 8] Kroeger contends that the Department's findings are contrary to the record evidence and are arbitrary. When, as here, an appellant challenges the findings of the administrative agency, the appellant cannot prevail unless he shows that the record compels contrary findings. *Lentine v. Town of St. George*, 599 A.2d 76, 80 (Me.1991). We do not find that an administrative agency has acted arbitrarily or capriciously unless its action is "wilful and unreasoning" and "without consideration of facts or circumstances." *Cent. Me. Power Co. v. Waterville Urban Renewal Auth.*, 281 A.2d 233, 242 (Me.1971) (quotation marks omitted).

### B.  Existing Scenic Uses

[¶ 9] The construction of a permanent structure in, on, or over a coastal wetland is an activity that requires a permit. 38 M.R.S.A. § 480–C (2001 & Supp. 2004). An applicant for a permit has the burden to demonstrate that the activity will not unreasonably interfere with existing scenic uses. 38 M.R.S.A. § 480–D(1). An applicant also has to meet the standards set forth in the regulations promulgated by the Department. One of those is the "avoidance" standard: "No activity shall be permitted if there is a practicable alternative to the project that would be less damaging to the environment." 2 C.M.R. 06 096 310–4 § 5(A) (2002). The regulation also states that even if there is no practicable alternative, "the application will be denied if the activity will have an unreasonable impact on the wetland." 2 C.M.R. 06 096 310–5 § 5(D)(1) (2002).

[¶ 10] In the decision denying Kroeger's application for a permit, the Department described Somes Sound, the location of the proposed dock, as "the only natural fjord on the east coast of the Unit-

---

**3.**  This section was amended by P.L.2001, ch. 618, § 3 (effective April 3, 2002).

ed States." It noted that Acadia National Park is located on the opposite side of Somes Sound from the proposed dock. The Department found that the dock would not blend into the shoreline and that "a light colored, linear structure 17 feet high and extending out into the sound represents a sharp visual contrast to the natural horizontal banding of the shoreline, and would degrade the scenic character of the natural shoreline of the Somes Sound fjord."

[¶ 11] The evidence before the Department included reports by experts opining on the visual impact of the proposed dock. Kroeger's expert concluded that the proposed dock would be "prominent only from close range," but that it would blend with the existing shoreline. Kroeger's expert commented that the visual impact of the proposed dock would diminish with distance:

> At extremely close range the structures can cross a viewers [sic] entire field of vision. At middle distances the structures cross a small percentage of a viewers [sic] field of vision, while distant viewers see the structures taking a very small percentage of their field of vision.

[¶ 12] The intervener submitted an expert's report to the Department that criticized the lack of information in Kroeger's expert's report regarding the existing scenic uses. The intervener's expert stated:

> People from all over the world come to view Somes Sound. The people who will see the proposed pier from boats and hiking trails will be largely recreationists who, as a group, and especially in a landscape of such national significance, primarily seek high quality settings. As such, they are very highly sensitive to changes in the landscape.

[¶ 13] In addition to the experts' reports on existing scenic uses and the visual impact of the proposed dock, the record contains photographs of the affected area, including photographs submitted by Kroeger containing simulations of the proposed dock. The photographs demonstrate the scenic beauty of the area and the lack of other docks. The photographs with simulations also demonstrate the interference of the proposed dock with the existing scene. The record evidence discloses that there are no other docks within 2000 feet of the location of Kroeger's proposed dock, and the other docks on the Sound are more secluded than the proposed dock and are not on the narrow reach of the Sound.

[¶ 14] The administrative record also includes comments by members of the public and neighbors. The comments attest to the unique scenic beauty of the area and the fear that the proposed dock would interfere with the scenery of the Sound. The Department noted that Somes Sound is used by many boaters to enjoy the beauty of the area. Department personnel also visited the site and took notice of the proposed location and its proximity to Acadia National Park. The record adequately supports the Department's finding that the proposed dock will interfere with existing scenic uses of boaters, hikers, and sightseers of Somes Sound.

[¶ 15] The dissent contends that the scenic use at issue is that of the wetland itself. Because "[c]oastal wetlands" are defined as "all tidal and subtidal lands," 38 M.R.S.A. § 480–B(2) (2001), the dissent concludes that there is seldom any scenic use of subtidal lands, because they are underwater and invisible to most people. However, section 480–D(1) does not limit the requirement of noninterference to existing uses of the coastal wetland itself. In *Conservation Law Foundation, Inc. v. Department of Environmental Protection*, 2003 ME 62, ¶ 33, 823 A.2d 551, 562, we focused on the "uses of the location in

which the pier or wharf is to be constructed." If the uses were limited to "tidal and subtidal lands" without the use of the water covering those tidal and subtidal lands, the requirement of noninterference with navigational uses in section 480–D(1) would not make sense.

[¶ 16] Furthermore, the dissent's finding that subtidal lands have no scenic use for anyone other than a scuba diver is contrary to the legislative finding that "coastal wetlands ... are resources of state significance ... [that] have great scenic beauty." 38 M.R.S.A. § 480–A (2001). The dissent's unduly restrictive construction of "scenic and aesthetic uses" to apply only to the land beneath the subtidal and tidal waters does not comport with the "broad, liberal interpretation" that we give to NRPA. *Murphy v. Bd. of Envtl. Prot.,* 615 A.2d 255, 259 (Me.1992). Finally, the dissent's application of section 480–D and the Department's regulations is contrary to the Department's interpretation of the statute it is charged with enforcing and the regulations it has promulgated, and we give deference to the Department's interpretation. *Id.* By visiting the surrounding area and considering the impact of the proposed dock on the boaters and hikers who flock to Acadia for the scenic beauty of the area, the Department has interpreted the statute and its own regulations to mean that the general location of the proposed activi-

ty is at issue when considering interference with existing scenic uses.[4]

C. Practicable Alternatives

[¶ 17] The Department determined that the interference that the proposed dock would have on scenic uses would be unreasonable because Kroeger had practicable alternatives to the construction of a dock. The Department regulations require a permit applicant to analyze alternatives to the proposed activity and "demonstrate that a practicable alternative does not exist." 2 C.M.R. 06 096 310–4, 310–7 §§ 5(A), 9(A) (2002). "Practicable" is defined as "[a]vailable and feasible considering cost, existing technology and logistics based on the overall purpose of the project." 2 C.M.R. 06 096 310–3 § 3(R) (2002). The Department found that Kroeger failed to meet his burden of demonstrating that a practicable alternative does not exist.

[¶ 18] Kroeger stated in his permit application that the dock would be used for recreational boating and that the purpose was to access dinghies, store them, and access his large boat that is moored nearby. Contrary to the requirement in the regulations to provide information regarding an alternatives analysis with the application, 2 C.M.R. 06 096 310–7 § 9(A), Kroeger failed to provide the information. By letter dated April 18, 2002, the Department listed additional information that was

---

4. A regulation adopted by the Department after Kroeger's application was considered describes the process for evaluating impacts to scenic uses. 2 C.M.R. 06 096 315 (2003). The regulation demonstrates that the Department does not interpret the statute or its regulations as limiting its inquiry to the lands beneath the tidal and subtidal waters. Chapter 315 defines Acadia National Park as a "scenic resource" because it is "visited by large numbers who come from across the country or state." *Id.* § 10. When there is a scenic resource, it is the "point from which an activity in, on, over, or adjacent to a pro-

tected natural resource is viewed." *Id.* Among other things, the Department looks at the "existing character of the surrounding area." *Id.* § 4. It is the general scenic use of the "landscape" that is considered. *Id.* § 4(D). This regulation makes clear that the Department construes "scenic uses" to mean scenic uses of the general location of the proposed activity. We do not apply this regulation to the present case. We refer to it only to demonstrate that it is consistent with the statutory and regulatory interpretation by the Department in this case.

required for processing. Included in this list were the following:

2. What is the draft of the boat the applicant intends to dock at the proposed pier?

3. In regard to practical alternatives for egress and ingress to the water, please provide evidence in regard to why the following alternatives are not practicable—

    a. Use of an existing public or commercial pier. Please include the distance to the nearest public piers in your response.

    b. Use of a three-point hitch and a dinghy.

    c. Use of a temporary structure.

. . . .

In responding to this letter, please carefully consider all alternatives for access and egress, and provide specific evidence on the practicability of all alternatives.

In response, Kroeger stated the drafts of his fifty-two-foot boat and his twenty-eight-foot powerboat. He noted that the float was designed primarily for skiffs and that there would also be kayaks. He responded that a dinghy and three-point hitch were impractical "because of the physical ability required to use one" and that the rocky shore was not conducive to the use of a three-point hitch. He stated that the public marina was two miles away.

[¶ 19] In the letter to the Department commenting on the draft decision, Kroeger stated that the dock would be used primarily by kayaks, canoes, a small rowboat, and an inflatable combination motor/row boat. He stated that he and his wife were ages sixty-two and fifty-eight and that it was not practical for them to load a vessel onto a vehicle and transport it to another location.

[¶ 20] The Department found that Kroeger has dock space and a mooring at the Northeast Harbor Town Landing for his large boat and that he is a member of a private marina in the area. The Department found that Kroeger did not demonstrate that he did not have practical alternative access to the water through the public and private marinas nearby and by launching small boats from his shore. The record supports these findings and does not compel a finding that no practicable alternatives existed, particularly in the absence of any information offered by Kroeger as to why shore launching was impracticable.

D. Arbitrariness

[¶ 21] Kroeger also argues that the Department's findings regarding the unreasonable interference with existing scenic uses are arbitrary. He refers to the finding that the proposed dock would sharply contrast with the shoreline and argues that the Department could not have made this finding except by ignoring the photographs with simulations and his expert's opinion that the dock would retain a dark green color that would be compatible with the surroundings. However, the Department's decision expressly refers to his expert's opinion, and it states that the Department did not agree with the assertion that the color would remain dark and blend into the shoreline. The decision adds that the Department's refusal to agree with Kroeger's expert on this issue is based on the opinion of the intervener's expert and on the observations by Department personnel. An agency does not act arbitrarily when it considers but disagrees with evidence submitted by one party and believes evidence submitted by another party. *Cent. Me. Power Co.*, 281 A.2d at 242.

[¶ 22] The Department also found that Kroeger had not met the NRPA standard requiring no unreasonable harm to the habitat, and Kroeger challenges that finding on appeal. However, because an applicant must meet all of the NRPA standards in order to obtain a permit, our affirmance of the Department's decision on the existing scenic uses standard renders discussion of the other standard superfluous.

The entry is:

Judgment affirmed.

DANA, J., with whom ALEXANDER, J., joins, dissenting.

[¶ 23] Because Kroeger's application for a permit to build a pier on his property met all of the Natural Resources Protection Act standards, I must respectfully dissent.

[¶ 24] To qualify for a permit an applicant must meet all nine of the Act's standards. 38 M.R.S.A. § 480–D (2001). Pursuant to 38 M.R.S.A. § 341–D(1–B) (2001), the Board of Environmental Protection promulgated rules implementing the Act. The rules require an applicant to avoid the activity if there are practicable alternatives that would be less damaging to the environment. 2 C.M.R. 06 096 310–4 § 5(A) (2002). Each applicant must provide an analysis of the alternatives available. *Id.* The regulations also require an applicant to minimize alteration and, in some cases, provide compensation. 2 C.M.R. 06 096 310–4 § 5(B), (C) (2002). Even if the project has no practicable alternative and the applicant has minimized the impact as much as possible, the regulations provide that there must be no unreasonable impact. 2 C.M.R. 06 096 310–5 § 5(D)(1) (2002).

[¶ 25] The Department determined that Kroeger failed to meet the Act's "existing uses" standard, which requires an applicant to demonstrate that "[t]he activity will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses," 38 M.R.S.A. § 480–D(1) (2001), that he also failed to meet the "harm to habitat" standard, which requires an applicant to demonstrate that "[t]he activity will not unreasonably harm any significant wildlife habitat ... or other aquatic life," 38 M.R.S.A. § 480–D(3) (2001),[5] and that there was a practicable alternative to a pier on his property.

[¶ 26] The Court did not reach the harm to habitat standard and did not address the Department's flawed reliance on cumulative prospective development. Instead, the Court concludes that the record adequately supports the Department's finding that the proposed dock will interfere with existing scenic uses. It also concludes that the record does not compel a finding that there was no practicable alternative to the pier. Because the record does compel findings that the impact on the scenic uses of the wetlands would be virtually nonexistent, the impact on the wetland habitat would be minor, and there was no practicable alternative to a pier on Kroeger's property, the Court compounds the Department's error.

[¶ 27] The Court also finds that the Department's determination that the color of the pier would sharply contrast with the shoreline was not arbitrary. Because both the Department and the Court misapply the scenic impact analysis from the outset, I do not address this issue.

[¶ 28] When the Superior Court acts as an intermediate appellate court, we directly review the decision of the administrative agency. *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 11, 832 A.2d 765, 768. We accord no deference to the Superior Court.

5. This section was amended by P.L.2001, ch. 618, § 3 (effective April 3, 2002).

*Conservation Law Found., Inc. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶ 22, 823 A.2d 551, 559. Thus, we directly review the Department's order to determine whether its decision is supported by evidence in the record and whether it is affected by any abuse of discretion or error of law. *Hannum*, 2003 ME 123, ¶ 11, 832 A.2d at 769; *see also Downeast Energy Corp. v. Fund Ins. Review Bd.*, 2000 ME 151, ¶ 13, 756 A.2d 948, 951.

A. The Impact on the Scenic Uses of the Wetland Would Be Virtually Non-Existent

[¶ 29] When determining whether a project would have an unreasonable impact on the wetland, the Department considers the "functions and values provided by the wetland." 2 C.M.R. 06 096 310-5 § 5(D)(1)(b) (2002). The regulations define "[f]unctions" to mean "[t]he roles wetlands serve which are of value to society or the environment including, but not limited to, ... scenic and aesthetic use." 2 C.M.R. 06 096 310-3 § 3(J) (2002).

[¶ 30] The Department suggests that because the project site is visible primarily by boaters and hikers, the wetland provides valuable scenic and aesthetic uses. Due to the regulatory language, however, the focus of the analysis must be on the scenic and aesthetic value "*provided by the wetland.*" 2 C.M.R. 06 096 310-5 § 5(D) (emphasis added). The wetlands at issue are coastal wetlands.[6] "Coastal wetlands" are defined by the NRPA as "all tidal and subtidal lands."[7] 38 M.R.S.A. § 480-B(2) (2001). Kroeger's pier has no impact on subtidal lands. Even if it did, subtidal lands are not regarded as particularly scenic or aesthetic, except perhaps by scuba divers, because they are underwater all the time, and generally invisible to hikers and boaters. Tidal lands are visible, especially at low tide when they are fully exposed; most of the time, tidal lands are only partially visible.

[¶ 31] Even when visible, there is no evidence that the tidal lands in Somes Sound are any different from the tidal lands elsewhere on the Maine coastline. No evidence was presented that hikers and sailors attribute a higher scenic and aesthetic value to Mount Desert tidal lands than other tidal lands. In fact, the rock, seaweed, sand, shells, and various critters that occupy the tidal lands, and may, on close inspection, offer some aesthetic value, are largely invisible to boaters in the Sound and hikers in Acadia.

[¶ 32] The Court notes that Somes Sound is "the only natural fjord on the

---

6. Limiting the focus of the analysis to coastal wetlands is consistent with the limited scope of the Act. Section 480-C prohibits the construction of a pier "on or over any protected natural resource." 38 M.R.S.A. §§ 480-B(7), 480-C(1), (2)(D) (2001). The Act defines "[p]rotected natural resource" as "coastal sand dune system, *coastal wetlands*, significant wildlife habitat, fragile mountain areas, freshwater wetlands, great ponds or rivers, streams or brooks, as these terms are defined in this article." 38 M.R.S.A. § 480-B(8) (2001) (emphasis added). Because coastal wetlands, as defined by the Act, are the only protected natural resource at issue here, we must limit the scope of our analysis to the Act's definition of that resource.

7. The definition of "[c]oastal wetlands" also includes the contiguous lowland area subject to tidal action during maximum spring tide levels. 38 M.R.S.A. § 480-B(2) (2001). This area could conceivably include a beach or other land-form that would be visible almost year round. In this case, however, the evidence in the record suggests that normal high tide reaches the embankment on the property. Since the pier would extend out perpendicular from the embankment into the Sound, the pier would not impact any of the additional land subject to tidal action during high spring tides.

east coast of the United States." While that may be true, in the context of coastal wetlands, the only area relevant to the analysis is the tidal land itself, not the landscape. Because tidal lands offer little scenic and aesthetic value to boaters and hikers in the area, the pier's impact on the scenic and aesthetic uses provided by the wetland would be virtually non-existent.

[¶ 33] The Department's determination that the pier would unreasonably impact scenic uses stems from its misapplication of the statutory and regulatory require- ments to scenery outside the scope of the Act. Accordingly, its decision not to grant Kroeger his permit is affected by error of law. Because the evidence in the record, properly applied, compels a finding that the pier would not unreasonably impact scenic uses, Kroeger meets the no unrea- sonable impact to scenic uses standard.

## B. The Impact on the Wetland Habitat Would Be Minor

[¶ 34] The pier's granite supports would cover only a small amount of wetland. Far from harming habitats, there is evi- dence in the record that the granite sup- ports would actually increase the area on which life can grow. Granite blocks are excellent attachment sites for algae, barna- cles, and mussels. Kroeger's plan envi- sioned stacking the granite blocks so as to allow water to circulate between them. Organisms would find shelter from the waves and predators between the blocks. With the surfaces of the blocks exposed, the wetland's surface area available for organisms to live and grow would increase.

[¶ 35] The Department of Marine Re- sources' (DMR) letter to the Department, dated May 31, 2002, lends additional sup- port to a finding of no unreasonable harm to habitat. In response to the Depart- ment's request for project review, and af- ter a visit to the property, the DMR stated that "[Kroeger's proposed pier] should not cause significant adverse impacts to ma- rine resources, or traditional fisheries."

[¶ 36] Further, the impact of the pier would be so minor that the Department's regulations do not require Kroeger to pro- vide compensation for the loss of wetland. The regulations only require an applicant to compensate for a loss of wetland if the area affected exceeds 500 square feet. 2 C.M.R. 06 096 310–5 § 5(C) (2002). Since Kroeger's pier would cover only 138 square feet of wetland, its impact is too minor to require compensation. The evi- dence, therefore, compels a finding that Kroeger's proposed pier would not unrea- sonably harm wetland habitat.

## C. The Practicable Alternative Analysis is Flawed

[¶ 37] In complying with the regulation's avoidance standard, Kroeger had the bur- den of establishing that no practicable al- ternative existed. 2 C.M.R. 06 096 310–4 § 5(A). The regulations provide that prac- ticable alternatives include:

(1) [u]tilizing, managing or expanding one or more other sites that would avoid the wetland impact; (2) [r]educing the size, scope, configuration or density of the project as proposed, thereby avoid- ing or reducing the wetland impact; (3) [d]eveloping alternative project designs, such as cluster development, that avoid or lessen the wetland impact; and (4) [d]emonstrating the need, whether pub- lic or private, for the proposed altera- tion.

2 C.M.R. 06 096 310–7 § 9(A) (2002).

[¶ 38] Kroeger persuasively argues that local marinas are not practicable alterna- tives to a pier on his property. Alterna- tives are practicable if they are "[a]vailable and feasible considering cost, existing technology and logistics based on the over-

all purpose of the project." 2 C.M.R. 06 096 310–3 § 3(R) (2002). Kroeger's application indicated that the overall purpose of the project was access to the water *from his property* in exercise of his right to wharf-out to navigable waters. *See Great Cove Boat Club v. Bureau of Pub. Lands,* 672 A.2d 91, 95 (Me.1996) (discussing the nature and scope of the riparian right to construct piers and wharf-out). Kroeger plainly wanted to recreate on the water around his property, not around the local marina. Kroeger also presented evidence in his application that, other than a pier, there was no practicable alternative for accessing the water from his property.[8] He stated that a three-point hitch and dinghy were impractical because his rocky shoreline would tend to snag the ropes. He also stated that a temporary structure was impractical because it would not be able to withstand the remarkably strong tidal currents present in the Narrows.

[¶ 39] Further, it is plain from the record that shore launching is not a practicable alternative. A steep embankment separates his home from the shoreline, the base of which is protected from erosion by boulders. The very presence of the boulders indicates that the high watermark reaches the base of this embankment, making shore mooring impossible and launching impractical. To the extent that the Department's order states that there are practicable alternatives to a pier for accessing the water from Kroeger's property, it is contrary to the evidence in the record.[9]

[¶ 40] Moreover, stating that shore access is a practicable alternative necessarily assumes the applicant's ability to drag or carry boats from some storage facility to the water at low tide. Such an assumption has no place in a practicable alternatives analysis. Plainly apparent from the Department's order, brief, and argument is its consideration of the physical and economic circumstances of the individual applicant in determining the existence of a practicable alternative. Implicit in finding that a marina is a practicable alternative is a finding that Kroeger is either physically capable of loading and unloading boats from his car, or financially able to hire people to do so. If this kind of analysis is permissible, an elderly or disabled individual would receive a permit but an able-bodied thirty-year-old would not. This level of discretion is plainly an overreading of the regulations. The Legislature could not have intended that the Department undertake such an arbitrary analysis when it enacted the NRPA.

[¶ 41] Other examples further highlight the arbitrary nature of the Department's reasoning. What if the marina was five, ten, or twenty miles away? How far is too

---

8. Kroeger primarily intended to use the pier for smaller boats, such as dinghies, kayaks, picnic boats, and other boats with a shallow draft. Tide permitting, Kroeger also expected to use the pier for boats with deeper drafts, such as his sloop, which is permanently moored at one of the local marinas.

9. In its decision denying Kroeger his permit, the Department stated that the applicant had not demonstrated that the marina and shore launching together would not meet his needs. Although the Department, as the Court notes, requested additional information regarding the use of an existing public pier, a three-point hitch, or a temporary structure, it did not request information regarding shore launching. Given the location and the nature of the shoreline, as evidenced by the many pictures and descriptions in the record, Kroeger should be entitled to presume that he met his burden proving that shore launching was impractical when he allowed the Department to visit and inspect the site. Even public comments objecting to the pier and offering alternatives did not go so far as to suggest that shore launching was a practicable alternative.

far? What if Kroeger had been rejected for membership in the private marina? Would an unwelcomed applicant receive a permit?

[¶ 42] The regulations anticipate that piers may not have a practicable alternative. "[P]rojects for which no practicable alternative may exist are limited to those necessary for: ... (3) [w]ater dependent uses." 2 C.M.R. 06 096 310–4 § 5(A)(3) (2002). A pier is a "water dependent use." 2 C.M.R. 06 096 310–3 § 3(W) (2002). A fair reading of the regulations is that the authors understood that a pier may have no practicable alternative. Certainly, in Kroeger's case, his pier did not have a practicable alternative. The Department's finding of one cannot form a basis for its order denying Kroeger a permit for his pier.

D. Reliance on Cumulative Prospective Development was Flawed

[¶ 43] In *Hannum*, we held that unsupported speculation about future development of piers that could cause the proposed pier to have an unreasonable impact in the future, even if it would not have an unreasonable impact now, cannot properly support an agency's decision. 2003 ME 123, ¶ 17, 832 A.2d at 770. But we also stated that the Department could deny an application if a proposed dock would add an incremental effect so as to create a cumulative impact. *Id.* ¶ 15, 832 A.2d at 769.

[¶ 44] In analyzing the cumulative impact of the pier, the Department referred to the "potential for visual clutter on this relatively undeveloped shoreline." This statement presents two problems. First, since the regulations are only concerned with the cumulative impact on the wetland, the Department erroneously considered the impact on the scenery. Second, this

kind of speculation is improper under *Hannum.*

[¶ 45] In fact, the evidence supports a finding that there is no cumulative impact. As the Department notes, the shoreline is relatively undeveloped. There are no piers within 2000 feet of Kroeger's property. Since this is the first pier on this particular stretch of wetland, the pier's incremental effect cannot create a cumulative impact. Thus, Kroeger's pier causes no unreasonable impact.