2000 ME 151

**DOWNEAST ENERGY
CORPORATION**

v.

**FUND INSURANCE REVIEW
BOARD.**

Supreme Judicial Court of Maine.

Argued June 5, 2000.

Decided Aug. 4, 2000.

Randall B. Weill, Esq., (orally), Ann R. Robinson, Esq., Joel H. Thompson, Esq., Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, for plaintiff.

Andrew Ketterer, Attorney General, Mary M. Sauer, Asst. Atty. Gen., (orally), Augusta, for defendant.

Panel: WATHEN, C.J., and RUDMAN, SAUFLEY, and ALEXANDER, JJ.

SAUFLEY, J.

¶ 1 DownEast Energy Corporation appeals from a judgment entered in the Superior Court (Kennebec County, *Studstrup, J.*), affirming the Fund Insurance Review Board's determination that DownEast was not entitled to recover from the Ground Water Oil Clean-up Fund, *see* 38 M.R.S.A. § 569-A (Supp. 1999), for expenses incurred in cleaning up contaminated soil on two of its sites. We affirm the judgment.

## I. BACKGROUND

¶ 2 This case represents a consolidation of two actions, one regarding the cleanup of the area surrounding an excavated oil storage tank at DownEast's South Portland office site and one regarding a cleanup at its Portland Congress Street Mobil site. At both sites, DownEast applied for reimbursement for its cleanup costs from the Ground Water Oil Clean-up Fund. *See* 38 M.R.S.A. § 569-A. Both applications were ultimately denied by the Department of Environmental Protection, and in both instances, DownEast presented a petition for de novo review of its application to the Fund Insurance Review Board. The cases were heard before the Board simultaneously, and have remained consolidated for purposes of this appeal.

A. The South Portland Office Site

¶ 3 When DownEast began preparation for the removal of an underground heating oil storage tank at its office site in South Portland, it retained J.B. Plunkett Associates, Inc., (JBP) to conduct a site assessment for possible petroleum contamination. Using guidelines provided by the Department of Environmental Protection, referred to as the "Hydrocarbon Spill Decision Tree," JBP advised DownEast that it would be required to remove all "free product" and to remove or remediate "soil saturated with gasoline, kerosene, or fuel oil" following the removal of the storage

tank. A field representative from the Department concurred.

¶ 4 After removing the storage tank, DownEast found and removed five gallons of heating oil that remained on the clay subsurface soils at the bottom of the excavation. Twelve soil samples were also taken from the excavation area. One sample revealed concentrations of petroleum vapor above the Department's notification level, and DownEast reported the finding to the Department's field representative. JBP also performed "a soil saturation test on [the contaminated soil] sample ... which did not identify petroleum-saturated soils."

¶ 5 DownEast then prepared to dispose of some of the surrounding soil. In order for DownEast to transport the soil to a disposal facility, it required certification from the Department regarding the nature of the soil contamination. The Department provided the required certification through what is referred to as a "virgin petroleum letter."[1] DownEast then removed over 236 tons of soil from the site and sought reimbursement for the costs of the removal from the Ground Water Oil Clean-up Fund. *See* 38 M.R.S.A. § 569-A.

¶ 6 Upon DownEast's application for reimbursement, the Department initially issued an order, containing findings of fact and an eligibility determination, in which it concluded that DownEast was "eligible for coverage by the Insurance Fund for eligible costs incurred" in removing the soil. According to the order, to receive the reimbursement DownEast was required to (1) meet the deductible of $2500, (2) provide the Department with copies of invoices or reports documenting the costs, and (3) perform any further cleanup to the satisfaction of the Department. The order specifically provided that no further cleanup was required.

¶ 7 When DownEast submitted its invoices, however, the Department "re-examined" its file regarding coverage of cleanup costs at the South Portland site and declined to approve payment from the Fund. It concluded that because DownEast was required only to remove saturated soil, and because JBP's tests revealed that there was no such soil at the site, DownEast was not entitled to any reimbursement from the Fund. Thus, it announced that "[s]ince the Department did not require the removal of any contaminated soils at this site, there are no eligible cleanup costs and DownEast Energy will not be reimbursed for any expenses."

## B. The Congress Street Mobil Site

¶ 8 DownEast also removed six underground oil storage tanks at its Congress Street Mobil site in Portland. Prior to the removal, DownEast's consultant, JBP, concluded that this site would similarly be targeted for baseline cleanup goals. A Department representative again concurred.

¶ 9 After the tanks were removed, JBP reported to the Department that three of the tanks had contaminated the surrounding soil. The Department representative evaluated the site and required that "only saturated soils and free product be removed from the site in accordance with baseline cleanup goals." JBP also inspected the site for contamination, and observed that "no saturated soils or any free product of any kind" were present in the excavations.[2] These observations were communicated to DownEast.

1. Virgin petroleum letters are the Department's method of certifying to the federal government, as well as the disposal facilities accepting waste soil, that the source of any soil contamination is known and is not "hazardous" as defined in certain federal regulations. Here, the source of the contamination, if any, was pure (or virgin) petroleum, which, under federal regulations, is designated non-

hazardous for purposes of certain types of soil disposal. The Department therefore issued a virgin petroleum letter for the South Portland site which allowed, but did not require, DownEast to remove soil from the area without conducting expensive hazardous waste testing that would otherwise be required.

2. In an internal Department document, the representative noted that "[t]hough I ob-

¶ 10 Nevertheless, DownEast removed over 3000 tons of soil from the site, and the Department's representative issued several virgin petroleum letters to allow DownEast to send the soil to Commercial Recycling Systems without conducting hazardous waste testing. In its report, JBP described the DownEast's rationale for removing the soil:

> Additional soils requiring removal for the installation of a new facility were also transported off-site based primarily on petroleum contamination.... A total of 3,101.78 tons of soil was removed (primarily as a result[] of new construction specifications, not baseline cleanup levels) and transported to Commercial Paving in Scarborough.

JBP did not note how much, if any, saturated soil was removed.

¶ 11 DownEast then filed its application with the Department for eligibility for reimbursement for the cleanup costs incurred at the Portland Mobil site.[3] Once again, the Department initially indicated that DownEast was eligible for reimbursement of eligible costs, but ultimately determined that none of DownEast's soil removal costs were "eligible" because there had been no saturated soil or free product found at the site. Accordingly, it concluded that DownEast was not entitled to any reimbursement from the Fund.

¶ 12 DownEast appealed both denials to the Board, which conducted a de novo hearing and reached the same conclusion as the Department. DownEast then appealed to the Superior Court, which affirmed the Board's decision. This appeal followed.

served no free product nor oil saturated soil, much of the tank fill around the gas and diesel was moderate to mildly oil contaminated, and required handling as special waste when removed[] for construction of the new facility." Another Department representative testified before the Board that the mild to moderately contaminated soil could have remained on site without any remediation.

## II. DISCUSSION

### A. Standard of Review

■ ¶ 13 When the Superior Court has performed an appellate review of an administrative decision, "we directly review an agency's decision for an abuse of discretion, error of law, or findings not supported by the evidence ... giv[ing] considerable deference to an agency's interpretation of its own internal rules, regulations, and procedures and will not set it aside, unless the rule or regulation plainly compels a contrary result." *Fryeburg Health Care Ctr. v. Department of Human Servs.*, 1999 ME 122, ¶ 7, 734 A.2d 1141, 1143 (citing 5 M.R.S.A. § 11007(4)(C) (1989); *Hale-Rice v. State Retirement Sys.*, 1997 ME 64, ¶¶ 8, 12, 691 A.2d 1232, 1235, 1236). Thus, we review directly the decision of the Board. *See* 38 M.R.S.A. § 568–A(3–A) (Supp. 1999) (authorizing judicial review of the Board's actions).

### B. The Groundwater Oil Clean-up Fund

¶ 14 The primary purpose of the Groundwater Oil Clean-up Fund is to protect the "quality of the waters of the State, including the ground water resources." 38 M.R.S.A. § 561 (Supp. 1999). The Legislature created the Fund when it enacted a series of other provisions directed at "conferring upon the department the power to deal with the hazards and threats of danger and damage posed by the storage and handling of oil in underground facilities and related activities." *Id.*

¶ 15 In order to provide incentives for the voluntary cleanup of a spill, the Fund is designed to allow the owner of an underground storage facility to recover certain "[e]ligible clean-up costs" related to the

3. The application form provided to DownEast by the Department was designed for the situation where the applicant applied for eligibility *prior* to conducting any cleanup activities, and it required the applicant "[t]o perform only those investigative and remedial tasks determined to be necessary by the Department."

cleanup of petroleum discharged from its underground tanks. *See* 38 M.R.S.A. § 562–A(7–A) (Supp. 1999). To recover, an owner must, among other things, make a written request to the Department within 180 days of reporting the discharge. *See* 38 M.R.S.A. § 568–A(1)(A) (Supp. 1999). The owner must include in its request a description of the areas threatened by the discharge and an agreement to pay a deductible, which is defined by the statute and is based on the number and type of underground tanks owned by the applicant. *See* 38 M.R.S.A. § 568–A(1)(A)(1), (2). If the applicant meets these basic requirements for eligibility, the Department issues an order to that effect and specifies the amount of the applicable deductible. *See* 38 M.R.S.A. § 568–A(1)(F).

¶ 16 *Eligibility* for recovery, however, does not guarantee that an applicant will be *entitled* to recover any of its cleanup costs.

> Any payments to or on behalf of applicants for clean-up activities undertaken by the applicant must be pursuant to a written agreement between the applicant and the commissioner. The agreement must include, but is not limited to:
>
> A. A plan and schedule for remedial actions;
>
> B. A provision for enforcement of the agreement and sanctions for nonperformance;
>
> C. Provisions for cost accounting and reporting of costs incurred in remediation activities;
>
> D. An agreement to clean up the site to the satisfaction of the commissioner.

38 M.R.S.A. § 568–A(4) (Supp. 1999).

¶ 17 Moreover, the Commissioner need only pay to the applicant any *eligible* cleanup costs that are over and above the applicant's deductible. *See* 38 M.R.S.A. § 568–A(2) (Supp. 1999). "Eligible clean-

up costs" are those direct expenses, including expenses for site investigation, that:

> A. Are necessary to clean up discharges of oil to the satisfaction of the commissioner;
>
> B. Are cost-effective and technologically feasible and reliable;
>
> C. Effectively mitigate or minimize damages; and
>
> D. Provide adequate protection of the public health and welfare and the environment.

38 M.R.S.A. § 562–A(7–A) (Supp. 1999).

C. Cleanup Requirements

¶ 18 Because DownEast was the party seeking reimbursement from the Fund, it bore the burden of proving that it was entitled to reimbursement.[4] In particular, DownEast was required to demonstrate that the expenses it incurred were "necessary to clean up discharges of oil to the satisfaction of the commissioner." 38 M.R.S.A. § 562–A(7–A)(A). The Board concluded that DownEast failed to prove that the soil removal at either site was "necessary to clean up discharges of oil." *Id.* Thus, it found that DownEast failed to carry its burden. We review the record to determine whether the Board's findings are supported by the record.

¶ 19 At the hearing, the Department reiterated its position that the Commissioner required only the removal of "saturated" soil at both sites. The Board also heard evidence that the DownEast was aware that only saturated soil required removal. Nonetheless, DownEast argues that it was entitled to reimbursement for contaminated, rather than saturated, soil and that the Department should not be permitted to change its first response to DownEast's request for reimbursement.

¶ 20 The Board found that DownEast was only required to remove saturated soil in order to clean up the site "to the satis-

---

4. Although the statute does not specifically allocate the burden of proof, the parties do not dispute that the burden fell upon Dow-

nEast. *Cf. Dowley v. Morency*, 1999 ME 137, ¶ 11, 737 A.2d 1061, 1066.

faction of the commissioner" and that DownEast was aware of that requirement. The record supports that finding. Regarding the South Portland site, the Board noted that DownEast did not contest the Department's determination that no saturated soil was removed from the site.[5] Because only free petroleum and saturated soil were required to be removed in order to clean up the site to the satisfaction of the Commissioner, and, because nothing meeting that description existed at the South Portland site, the Board concluded that no soil removal was eligible for reimbursement pursuant to section 562–A(7–A)(A).[6] As to the Congress Street site, the Board had before it evidence that, prior to any tank removal, the Department's representative visited the site and assigned it a similar baseline cleanup status, thus requiring removal of only saturated soil, and that the site contained little, if any, saturated soil. On this evidence, Board was not compelled to conclude that any or all of the soils removed fell within the definition of those that were eligible for fund reimbursement.

## D. Equitable Estoppel

■ ¶ 21 DownEast next argues that the Department should be equitably estopped from denying reimbursement because the Department's initial orders, containing findings of fact that all soil removal had been undertaken at the request of the Department, "led DownEast Energy to believe that the soil removal was authorized in accordance with applicable law." *See City of Auburn v. Desgrosseilliers*, 578 A.2d 712, 714 (Me.1990) (allowing application of equitable estoppel when "the declaration or acts relied upon ... induced the

party seeking to enforce the estoppel to do what resulted to his detriment, and what he would not otherwise have done").

¶ 22 The Department conceded at the hearing before the Board that several statements included in the standard form orders were "just wrong." The orders were issued, however, after the soil had been removed. Thus, DownEast could not have relied on the orders in removing the soil. Although the Department's use of the standard form orders led to confusion in the resolution of this matter, the orders cannot form the basis of a claim for equitable estoppel. Nor was the Board compelled to find that the statements contained in the orders were actually correct reflections of statements or promises made orally to DownEast before the soil was removed. Accordingly, the Department cannot be equitably estopped from denying Fund coverage regarding the South Portland or Congress Street sites.

## E. The Hydrocarbon Spill Decision Tree

■ ¶ 23 DownEast also argues that the Department's "Hydrocarbon Spill Decision Tree" was treated as if it were an enforceable rule even though the Decision Tree had not been adopted pursuant to 5 M.R.S.A. §§ 8052–8054 (1989 & Supp. 1999). There is no dispute that the Decision Tree has not been adopted as a Department rule. An agency may, however, provide guidance for its employees and the public without adopting the guiding materials as rules, as long as those materials are not intended to have, and are not given, the force and effect of law. *See York Mut. Ins. Co. of Me. v. Superintendent of Ins.*, 485 A.2d 239, 242 (Me. 1984).[7]

---

5. After being alerted to soil contamination at the site, the Department representative inspected the site and found no free product and no saturated soil. DownEast's own consultant, JBP, in its final site assessment, noted that "[t]he majority of the removed soil was not heavily contaminated (not petroleum saturated) but was removed to allow more compactable soils to [be] backfilled in the tank excavation." DownEast did not present any

evidence of the amount of saturated soils at either site.

6. Though approximately five gallons of free product were pumped from the excavation. DownEast has made no claim for reimbursement of that cost.

7. When the guidance or instructions are "intended solely as advice to assist persons in

¶ 24 The Department argues that the Decision Tree was not intended to supplant the statutory requirements for Fund reimbursement, and that it does not treat the Decision Tree as if it were a judicially enforceable rule. Rather, the Decision Tree is intended to provide guidance to professionals and site owners in determining what expectations the commissioner may have regarding the extent of cleanup required at particular sites.

¶ 25 Regardless of the Department's use of the Decision Tree, however, the Board did not rely on the Decision Tree in its own conclusions regarding reimbursement eligibility. The Board relied, instead, on the language of the statute declaring eligible costs to be those costs that are "necessary to clean up discharges of oil to the satisfaction of the commissioner" and cited, correctly, the applicable statute, 38 M.R.S.A. § 562–A(7–A). Finding that the Commissioner had not required removal of soil unless it was petroleum saturated,[8] and that DownEast was aware of the requirement, the Board concluded that DownEast had not proved that its removal of the soil from either site was necessary to meet the requirements of the Commissioner on the facts specific to each site.[9] We find no error in that conclusion.

The entry is:

Judgment affirmed.

determining, exercising, or complying with their legal rights, duties or privileges," the materials need not comply with the procedures for the adoption of rules pursuant to the Administrative Procedures Act. 5 M.R.S.A. § 8002(9)(B)(4) (1989).

8. DownEast's argument, although not stated in this fashion, is essentially that the Department should have adopted much more detailed rules regarding eligibility for fund reimbursement. The Legislature chose in this instance to give broad discretion to the Commissioner to allow individual sites to be addressed as best suited for public health and safety. Moreover, in order to permit site owners to understand what is required in particular instances, the legislation anticipates that the owner and the Department enter into a written agreement prior to cleanup. *See* 38 M.R.S.A. § 568–A(4) (Supp. 1999). DownEast's failure to obtain an agreement prior to the removal of the soil exacerbated the confusion regarding the Department's position in this case.

9. DownEast conceded before the Board that much of the soil removal was undertaken in order to facilitate new construction on the sites.