2002 ME 87

**STATE of Maine**

v.

**Carrie AUDETTE**

**No. Kno–01–607.**

Supreme Judicial Court of Maine.

Argued: March 5, 2002.

Decided: May 30, 2002.

G. Steven Rowe, Attorney General, James M. Cameron, Asst. Attorney General (orally), Lara Nomani, Asst. Attorney General, Augusta, for State.

Joseph W. Baiungo, Esq. (orally), Belfast, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Carrie Audette appeals from the judgments of conviction entered in the Superior Court (Knox County, *Mead, J.*) following a jury verdict finding her guilty of two counts of trafficking in schedule W drugs (Class B), 17–A M.R.S.A. § 1103 (Supp.2001). She contends that the court erroneously instructed the jury on the entrapment defense, and that the error was not harmless. We agree and vacate the judgments.

## I. STATEMENT OF THE CASE

[¶ 2] In 1997, Dorothy Fuller and her boyfriend, Vance McMahan, were arrested for possession of between sixty and seventy bags of heroin. While their cases were pending, the couple agreed to cooperate with the Maine Drug Enforcement Agency (MDEA) and serve as confidential informants. At that time, they gave the MDEA information about the drug trade in the Rockland area, and specifically about who they knew dealt and used illegal drugs. Audette's name was not part of this initial list. The MDEA asked them to "put out feelers" into the drug world to acquire information about who was currently dealing drugs. From December 1999 through March 2000, Fuller and McMahan worked for the MDEA and helped to organize and participate in the controlled purchases of illegal drugs from multiple dealers in the Rockland area. On two occasions, they were able to organize and complete controlled purchases from Audette. However, the circumstances surrounding these transactions were disputed at trial.

[¶ 3] According to Fuller, she and Audette had attended high school together but were never close friends. In August 1999, they became reacquainted and started to talk on the telephone one to two times per week. They talked about numerous aspects of the drug culture, from Fuller's own drug problems and activities to the general effects of heroin withdrawal. Fuller testified that in December 1999, she told Audette that she had started to use drugs again and asked her whether she knew if there were any in the area. When Audette answered in the affirmative, Fuller and McMahan set up a controlled purchase. Audette sold McMahan six bags of heroin for $180.

[¶ 4] In March 2000, Fuller asked Audette if she could obtain cocaine for her. Again Audette answered in the affirmative and a second controlled purchase was attempted. This time, however, the transaction was not completed. Later that March, a final controlled buy was organized. On this occasion, McMahan went to

Audette's home and bought twenty Ritalin pills for forty dollars.

[¶ 5] Fuller denied giving Audette presents or otherwise becoming close with her. She denied telling Audette that she was sick and denied pressuring Audette to sell drugs.

[¶ 6] Audette did not dispute that she sold the drugs but instead relied entirely on the defense of entrapment. She testified that she and Fuller developed a much closer relationship than that which Fuller admitted. She testified that Fuller gave her sweaters and toys for her children, that they met for coffee at Fuller's apartment, and that they talked often on the telephone. Audette testified that by the end of November 1999, Fuller started to talk about obtaining drugs, and asked Audette if she could get some for her. She testified that Fuller asked her to get drugs for her ten times. Audette stated that she finally agreed to obtain heroin for Fuller because she sounded "desperate and scared." According to Audette, Fuller told her that she was going through heroin withdrawal and that she was very sick, that she was vomiting, had diarrhea, and that she could possibly die.

[¶ 7] Audette testified that Fuller begged her on many occasions to get cocaine for her. She admitted that she bought cocaine in order to sell it to Fuller, but stated that she never sold the drug. Furthermore, Audette testified that Fuller asked to buy Ritalin on a number of occasions. Audette explained that she was prescribed the medication by her doctor and that she was hesitant to sell it because she needed the medication for her illness. She admitted that one of the reasons she finally agreed to sell Ritalin was to make some extra money to pay her bills. Audette maintained that she had never sold drugs prior to the first controlled buy nor did she ever intend to do so.

[¶ 8] The court agreed to instruct the jury on the entrapment defense. The entrapment instruction contained within the Maine Jury Instruction Manual provides, in pertinent part:

> Where the issue is raised by the evidence [as it has been in this case] then the State must prove beyond a reasonable doubt that the defendant was not entrapped—that he was predisposed to commit the criminal act prior to first being approached by law enforcement officers or their agents.

Donald G. Alexander, Maine Jury Instruction Manual § 6–45 (4th ed.2001). The court, however, decided that this instruction brought it "dangerously close to commenting upon the evidence itself." Therefore, the court instructed the jury: "If the issue of entrapment is raised by the evidence, then the State must prove beyond a reasonable doubt that the defendant was not entrapped; that she was disposed to commit the crime prior to first being approached by law enforcement officers or their agents." Audette objected to this instruction on the grounds that it called for the jury to determine a question of law and that it failed to properly place the burden of proof upon the State. After the jury found her guilty of both counts, Audette filed this appeal.

## II. DISCUSSION

[¶ 9] We review jury instructions "as a whole to ensure that they inform[ed] the jury correctly and fairly in all necessary respects of the governing law." *State v. Daniels*, 663 A.2d 33, 36 (Me.1995) (quoting *State v. Cumming*, 634 A.2d 953, 957 (Me.1993)).

[¶ 10] It is fundamental that the entrapment defense includes two elements, "[f]irst, government action must have induced the defendant to commit the crime;

second, the defendant must not have been predisposed to commit the crime." *State v. Farnsworth*, 447 A.2d 1216, 1218 (Me. 1982). Although the defendant must establish a prima facie case of entrapment, "[t]he evidentiary threshold required to generate the issue of entrapment is low." *State v. Davis*, 591 A.2d 1299, 1300 (Me. 1991). "Even unsubstantial evidence of entrapment necessitates a jury charge on this defense. All that is necessary for the issue of entrapment to be generated is for the record to disclose evidence of entrapment of such nature and quality as to warrant a reasonable hypothesis that entrapment did occur." *State v. Bisson*, 491 A.2d 544, 548 (1985) (internal citations omitted).

[¶ 11] We have made it clear that the determination of whether entrapment has been raised by the evidence is a threshold question of law that must be decided by the court. *Davis*, 591 A.2d at 1300. This determination is an important one because once a defendant establishes a prima facie case, it becomes the State's burden to disprove entrapment beyond a reasonable doubt. *State v. Matheson*, 363 A.2d 716, 722 (Me.1976).

[¶ 12] In the present case, the court's entrapment instruction was error. Although the court correctly determined that Audette had sufficiently raised the issue of entrapment, its instruction failed to place the burden of disproving the defense squarely upon the shoulders of the State. Instead, the court retreated and posed to the jury the same threshold question that it had just determined. The court's instruction effectively enabled the jury to second-guess this determination and decide to not reach the entrapment issue. *United States v. Tate*, 554 F.2d 1341, 1344 (5th Cir.1977).

[¶ 13] Having found that the entrapment instruction was error, we cannot say that it was harmless. We note that there was much evidence in the record upon which the jury could have based a guilty verdict. Nevertheless, the fact remains that because of the court's instruction the jury might not have even considered Audette's only defense. It is thus conceivable that the jury did not find that the State had disproved entrapment beyond a reasonable doubt. *See State v. Raubeson*, 488 A.2d 1379, 1380 (Me.1985).

The entry is:

Judgments vacated.