2006 ME 51

**Anne S. HANNUM**

v.

**BOARD OF ENVIRONMENTAL PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 18, 2005.
Decided: May 8, 2006.

---

Edmond Bearor, Esq., Timothy A. Pease, Esq. (orally), Rudman & Winchell, Bangor, for the plaintiff.

G. Steven Rowe, Attorney General, Margaret Bensinger, Asst. Atty. Gen. (orally), Office of Attorney General, Augusta, for the defendant.

James Nixon, Esq. (orally), Gross, Minsky & Mogul, Bangor, for Intervenors Friends of Acadia.

Douglas B. Chapman, Esq. (orally), Emily M. Beck, Esq., Eileen McGlinchey Fahey, Esq., Fenton, Chapman & Kane, P.A., Bar Harbor, Thomas Watt, pro se, Mount Desert, for Intervenors Millicent Higgins and Ruth Horsman.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, CALKINS, LEVY, and SILVER, JJ.

Dissent: ALEXANDER and DANA, JJ.

SAUFLEY, C.J.

[¶ 1] The Board of Environmental Protection, Friends of Acadia, and Millicent Guptill Higgins and Ruth Higgins Horsman appeal from a decision of the Superior Court (Hancock County, *Jabar, J.*), vacating the Board's denial of Anne S. Hannum's permit application pursuant to the Natural Resources Protection Act. *See* 38 M.R.S.A. § 480–C (1989 & Supp.1999). The challengers contend that the Board's findings with respect to Hannum's application to build a dock are supported by substantial evidence in the record. We agree and vacate the judgment of the Superior Court, remanding the matter for a judgment affirming the Board's decision.

## I. BACKGROUND

[¶ 2] This is the second time that this matter has been before us. Hannum is a trustee and beneficiary of the Anne Stroud Hannum trust, which owns a parcel of property in Long Cove, Bar Harbor. Hannum's land consists of approximately sixty-two acres with approximately 1200 feet of water frontage. Nearby parcels are owned by individuals and include the Nature Conservancy's Indian Point Preserve. In addition to the Nature Conservancy property, many of the nearby parcels are conservation lands, including one abutting parcel, over which the individual owner has granted a conservation easement to Acadia National Park. The abutting property to the west of Hannum's parcel contains a dock, although the parcels of land to the east of Hannum's property remain mostly undeveloped.

[¶ 3] In November 1999, Hannum submitted an application to the Department of Environmental Protection pursuant to 38 M.R.S.A. § 480–C for a permit to install a pier, ramp, and float in a coastal wetland on the shore of the property located in Long Cove. The proposed pier would measure ninety feet long and five feet wide, with a forty-foot-long ramp extending to a sixteen-by-twenty-foot float. Hannum received approval or acceptance of the project from the Army Corps of Engineers, the United States Environmental Protection Agency, the United States Fish and Wildlife Service, the National Marine Fisheries Service, the Maine Historic Preservation Commission, and the Maine Department of Inland Fisheries and Wildlife.

However, twenty-three interested persons filed letters of concern and/or opposition with the Department.

[¶ 4] In response to the concerns generated by Hannum's application, the Board found the project of significant public interest, assumed jurisdiction pursuant to 38 M.R.S. § 341–D(2) (2005), and scheduled the matter for public hearing. In addition, the Board granted intervenor status to Higgins and Horsman, Thomas L. Watt, and the Friends of Acadia. The Board held a public hearing on the matter, during which a number of experts testified on structural engineering and wildlife biology pertinent to the Board's decision. Four wildlife biologists presented information to the Board, three opposed to the building of the pier and one who found no significant problems associated with the pier and only recommended that it not be constructed during the seal pupping season between May and June.[1]

[¶ 5] In May 2001, the Board denied the permit for three reasons. First, the Board found that the proposed pier would "unreasonably interfere with existing scenic and aesthetic uses" by impacting wildlife in the cove, thereby interfering with public viewing of that wildlife. Second, the Board found that the proposed pier would "unreasonably harm significant wildlife habitat, aquatic habitat, and other aquatic life in that the permanent pier will increase boat traffic in the cove which will disturb the existing tern and seal colonies." Specifically, the Board found:

> [T]he proposed pier, by itself, might not have an unreasonable adverse impact on marine life. However, the cumulative impact of this large pier, together with the increased boat traffic from this and other piers which would likely follow if

this pier were approved ... poses a substantial threat to do unreasonable and irreversible harm to the aquatic life in this special cove.

Finally, the Board found that Hannum had reasonable and practicable alternatives to the proposed pier.

[¶ 6] Hannum appealed to the Superior Court, which affirmed the Board's decision. On October 15, 2003, we vacated the Superior Court's decision and remanded the case to the Board based on its erroneous finding that additional docks would likely be built if it granted Hannum a permit. *Hannum v. Bd. of Envtl. Prot. (Hannum I)*, 2003 ME 123, ¶ 17, 832 A.2d 765, 770. We determined that the Board's finding was based on mere speculation and had no support in the record. *Id.* ¶ 16, 832 A.2d at 770. We stated, "[a]lthough the Board could reasonably conclude that the Hannum dock itself would generate additional boat traffic, there was no evidence that the granting of this permit could reasonably be anticipated to result in the building of *more docks.*" *Id.*

[¶ 7] On remand, the Board did not reopen evidence, but made new findings based on the evidence in the original record. Once again, the Board denied Hannum's permit for three reasons. The Board found that "[t]he proposed activity would unreasonably harm aquatic habitat and other aquatic life in that the permanent pier would increase boat traffic in the cove which will disturb the existing tern and seal colonies." In addition to the unreasonable harm to aquatic life caused by increased boat traffic, the Board found that "the proposed activity would unreasonably interfere with existing scenic and aesthetic uses in that the project would

---

1. The information presented to the Board consisted of direct testimony and letters of    interest filed prior to the hearing.

cause an unreasonable adverse impact to aquatic life and the aquatic habitat supporting seals and terns in the cove, and would unreasonably interfere with the existing public viewing of those wildlife species." Finally, the Board concluded that Hannum failed to meet the avoidance, minimal alteration, and no unreasonable impact requirements of the Wetland Protection Rules because she "has reasonable and practicable alternatives to constructing a permanent pier; and the construction and use of the dock would likely disturb an endangered species."

[¶ 8] Upon the Board's second denial of her permit application, Hannum filed a petition for review of final agency action in the Superior Court pursuant to M.R. Civ. P. 80C. The Superior Court vacated the Board's decision and ordered the Board to grant the permit to Hannum. The court concluded that there was simply not enough evidence in the record to support a finding that Hannum's use of her dock for the summer will cause a detrimental impact on aquatic life or its viewing.

## II. DISCUSSION

### A. Standard of Review

[¶ 9] When the Superior Court acts in its intermediate appellate capacity in reviewing the decision of an administrative agency, we directly review the agency's decision on appeal. *DownEast Energy Corp. v. Fund Ins. Review Bd.*, 2000 ME 151, ¶ 13, 756 A.2d 948, 951. Decisions of the Board of Environmental Protection are reviewed directly for findings not supported by evidence in the record and for abuse of discretion or other errors of law. *See id.; Connolly v. Bd. of Soc. Work Licensure*, 2002 ME 37, ¶ 6, 791 A.2d 125, 127. "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶ 6, 703 A.2d 1258, 1261. Although we are not bound by the conclusions of the Board, an "administrative agency's interpretation of a statute administered by it ... will be given great deference and should be upheld unless the statute plainly compels a contrary result." *Thacker v. Konover Dev. Corp.*, 2003 ME 30, ¶ 14, 818 A.2d 1013, 1019 (quotation marks omitted).

### B. The Natural Resources Protection Act

[¶ 10] The Maine Legislature enacted the NRPA to regulate the alteration of resources of state significance, including coastal wetlands. 38 M.R.S. § 480–A (2005). In establishing the purpose of the NRPA, the Legislature acknowledged that "*uses* are causing the rapid degradation and, in some cases, the destruction of these critical resources." *Id.* (emphasis added). In order to prevent such degradation and destruction, the Legislature instructed the Department of Environmental Protection to "provide coordination and vigorous leadership to develop programs to achieve the purposes of this article." *Id.* Recognizing "that the cumulative effect of frequent minor alterations and occasional major alterations of these resources poses a substantial threat to the environment and economy of the State and its quality of life," *id.*, the NRPA requires permits for certain activities, including "[a]ny construction, repair or alteration of any permanent structure" that "is located in, on or over any protected natural resource," 38 M.R.S.A. § 480–C(1), (2). The Board of Environmental Protection is statutorily granted the authority to approve or deny permits in certain circumstances, including when an application has generated substantial public interest. 38 M.R.S. § 341–D(2)

[¶ 11] The NRPA establishes that the Board shall grant a permit when "it finds that the applicant has demonstrated that the proposed activity meets the following standards." 38 M.R.S.A. § 480–D (Supp. 1999). The statute then lists nine standards to be applied in reviewing a permit application, including:

> 3. Harm to habitats; fisheries. The activity will not unreasonably harm any significant ... aquatic habitat ... or other aquatic life.

38 M.R.S.A. § 480–D(3) (1989 & Supp. 1999).

## C. The Board's Decision

■ [¶ 12] The Board denied Hannum's permit application for, among other reasons, failing to meet the standard outlined above, and we focus on that finding.[2] Specifically, the Board concluded that "[t]he proposed activity would unreasonably harm aquatic habitat and other aquatic life in that the permanent pier would increase boat traffic in the cove which will disturb the existing tern and seal colonies." Hannum challenges the finding on two grounds: first, she asserts that the Board erred in considering the ramifications of increased boat traffic; second, she challenges the factual basis for the finding. We address each challenge in turn.

### 1. Increased Boat Traffic

■ [¶ 13] Hannum argues first that the Board lacked the power under the NRPA to deny her permit application based on increased boat traffic related to her new dock. She contends that the Board was limited in its review to determining whether the dock, by itself, would harm the seals or terns.

■ [¶ 14] We decline to accept Hannum's restricted view of the Board's authority. Contrary to her contention, the Board has the power to deny a permit application for a dock based on the dock's use. Although the NRPA does not empower the Board to regulate boating directly, the purpose of the NRPA is to prevent the degradation of protected resources (including coastal wetlands) caused by human use. 38 M.R.S. § 480–A. The use of the structure cannot be divorced from the structure itself. *See Brady v. Fed. Energy Regulatory Comm'n*, 416 F.3d 1, 7–8 (D.C.Cir.2005) (affirming the grant of a permit to expand a marina upon balancing the benefits of the expansion against the detriments of increased boat traffic resulting from the use of the marina). For example, the existence of a helicopter pad may pose no threat to wildlife, but the use of the pad by helicopters may disrupt wildlife significantly. Mindful of this comparison, although the structure of the dock alone may be analyzed for potential harms, the reason for the proposed existence of the dock also presents the potential for harm that the Board may analyze. *See Hannum I*, 2003 ME 123, ¶ 16, 832 A.2d at 770. Nothing in the NRPA prevents the Board from considering that harm, and as an agency charged with administering the NRPA, we will accord deference to the Board's reasonable conclusion that it may examine the impact of the use of a structure for which a permit is required along with the impact of the structure itself. *See Thacker*, 2003 ME 30, ¶ 14, 818 A.2d at 1019.

---

**2.** Because we determine that the Board's finding is sufficient with respect to the standard set forth in 38 M.R.S.A. § 480–D(3) (Supp.1999), the decision of the Board may be affirmed without further examination of the other challenged standards, as the NRPA requires an applicant to demonstrate that the proposed project meets each of the standards. 38 M.R.S.A. § 480–D (1989 & Supp.1999); *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 22, 870 A.2d 566, 573.

[¶ 15] Having recognized that "uses are causing the rapid degradation ... of ... critical resources," 38 M.R.S. § 480–A, the Legislature's purpose in enacting the NRPA is fulfilled by the Board's examination of increased boating in the area resulting from the presence and availability of the proposed dock. Thus, we conclude that the Board did not err in examining the impact that the dock and its reasonably anticipated uses would have on local wildlife.

2. Harm to Wildlife

[¶ 16] We turn then to the Board's factual conclusion that increased boat traffic resulting from the proposed dock will harm aquatic life. To support its conclusion, the Board credited the testimony and documentation of Dr. John Anderson, ornithologist and professor at the College of the Atlantic; wildlife biologist Steve Pelletier; and Leslie Cowperthwaite, Director and Founder of Maine Seal and researcher of the seals at Indian Point for fifteen years.[3]

[¶ 17] The Board found that the proposed site of the dock was approximately 1400 feet from a Common Tern nesting colony. Anderson testified that this particular colony is the largest or second largest unmanaged tern nesting colony north of Long Island Sound. The Board was persuaded by Anderson and Pelletier, who testified that while viewing the Common Tern colony, they had each sighted a Roseate Tern, which is listed as endangered in the Maine Endangered Species Act. *See* 12 M.R.S. § 12803(3)(H) (2005). The

Board noted the effect the proposed dock would have on the tern colony:

> According to Dr. Anderson, any additional boating activity at the site will disrupt the nesting and feeding activity of the birds at this colony and this may in turn impair their reproductive success and use of the site. In direct testimony, Dr. Anderson stated that low-level disturbances would cause a gradual reduction in numbers of birds using the site, increased flightiness around the island, decreased productivity, and eventual abandonment of the site. Dr. Anderson further testified that both species of terns feed on fish immediately below the water surface; even a slight sheen of oil or engine fuel can seriously compromise the bird's waterproofing and lead to death from hypothermia. He concluded that "it is my professional opinion at this point that increased human activity in that region will have a profound effect on the birds nesting in this area."

[¶ 18] In addition to the tern nesting colony, the Board found that the proposed dock would be located in a unique seal habitat. Citing to a letter of Leslie Cowperthwaite, Director and Founder of Maine Seal, the Board noted: "According to Ms. Cowperthwaite, the proposed dock would intrude into the middle of the Harbor seal habitat, and boats leaving from and returning to the dock would disrupt seals that are hauled out on land as well as those floating and swimming in the water."

[¶ 19] With respect to Hannum's purpose for building the dock, the Board concluded that, based on the number of boats owned by her extended family in the area

---

**3.** Cowperthwaite pre-filed testimony, but because she did not appear personally to testify, the pre-filed testimony was excluded by the Board. *See* 2 C.M.R. 06 096 030–9 § 9(B)(4) (1994). Although her pre-filed testimony was excluded, the Board's decision relied on comments made by Cowperthwaite in a previous letter, submitted to the Department of Environmental Protection dated November 28, 1999. *See* 2 C.M.R. 06 096 030–5 § 5(B) (1994). No party has challenged the Board's reliance on Cowperthwaite's letter and we, therefore, assume no error.

and her own admitted intentions to buy three boats, the increased boat traffic in Long Cove would be significant:

> The applicant's stated purpose of the project is for access to recreational boats. Mrs. Hannum indicates, in direct testimony, an interest in having three boats at the property, a row boat, a Whaler and a sailboat, that she would access from the dock and moor off the dock when not in use. She requests in her testimony to have a "family dock" for her children and grandchildren. It is reasonable to conclude, based on the evidence in the record of Mrs. Hannum's large extended family with boats in the area, that the boat traffic in Long Cove necessarily resulting from the construction of the proposed dock will be increased and will likely include more than Mrs. Hannum's individual use. Steve Pelletier testified that while the pier, by itself with no activity, would not be a threat to the seals, changing patterns in the use of the cove by people and changing patterns of use by recreational boaters pose a real threat to the seals.

Finally, the Board indicated that it reviews cumulative impacts to the environment by considering previous impacts to the resource along with the impacts of the proposed project to determine if the proposed project will result in a substantial threat to the resources protected by the NRPA. The Board found:

> The most compelling evidence in regard to whether the proposed project, together with the existing development in and around Long Cove, would result in a cumulative impact to aquatic habitat is the evidence of the effects of increased boat traffic on the Harbor seals in the cove. Leslie Cowperthwaite ... describes how the Harbor seals have already been displaced by the existing boat traffic between Black and Green Island, and how seals will not be able to sustain the detrimental effects of increased human activity in the cove. Steve Pelletier ... also identified concerns about the cumulative impact of increased boat traffic on aquatic life. In addition, the Board finds credible Dr. Anderson's conclusion that additional boating activity at the site would disrupt tern nesting and eventually lead to tern abandonment of the site. The Board has considered the cumulative impacts of increased boat traffic, together with the existing boat traffic in the cove, in its findings on harm to habitats.

The Board's decision accurately reflects the statements and qualifications of Anderson, Pelletier, and Cowperthwaite.

[¶ 20] Anderson worked for ten years with the United States Fish and Wildlife Service and helped draft the original tern recovery program for the State of Maine. He has sporadically monitored the tern colony at Indian Point since 1988. At the hearing, Anderson testified extensively about the tern nesting site in Long Cove. When asked about the particular features that make the cove a good site for its unmanaged tern colony, Anderson provided an informed, detailed explanation:

> Q. What is it about this particular island that makes it a good unmanaged site?
>
> A. I think it's important to realize that it's not just the island. It's a combination of island and water. Terns like to have a sheltered island with relatively low vegetation and the Roseate Tern in particular seems to prefer areas that at the turning of the tide would give you a bit of a riffle of which they can feed, and if you look at the region off Indian Point, it meets all of these criteria. You have these low ledges that have low, dense vegetation suitable for nesting habitat .... [T]he numerous ledges immediate-

ly around the actual nest site provide this riffle effect with the water passing over them as the tide moves, and this seems to draw the fish in an area where these birds can feed. I might add that both the Roseate and Common Tern are essentially surface feeders. They're not diving deep into the water. They are feeding on fish very close to the surface, and it's entirely possible that the mixing effect of the water flowing over the sunken ledges is bringing the fish in and close to the surface where the birds are able to feed. So you've got a combination of a very suitable nesting site and also ideal feeding grounds for these birds all in the very compacted area.

Having described the unique features of the cove, Anderson responded to questions regarding the effects of Hannum's proposed dock on the tern colony:

Q. Would the construction of a dock on Ms. Hannum's property give you any concerns about the tern nesting colony on the island here?

A. Yes, it does … I do have great concern over this dock and the activities that are inevitably going to be associated with this dock. This is a very special area. We are not just talking about any dock or any particular bay on the coast. Birds vote with their feet and the birds have selected over a very long period of time this particular region as a nesting area. So that right there makes it a significant region. I feel genuinely sorry for Mrs. Hannum. I wish that this weren't the case, but this is a very particular, very special bit of water, and it's very unfortunate her dock is going to be sticking right into the heart of that area, and inevitably there are going to be activities associated with that dock that would increase boat traffic, increase the human presence, not just on the shoreline but actually in the very body of water that these birds are using for their feeding and inevitably in the vicinity of the island that they're using for nesting. So I find this of great concern.

Anderson indicated that the harm to terns would probably not occur immediately upon the building of the dock, but would be gradual:

[T]erns tend to respond either very dramatically or very slowly to particular types of disturbance. With an acute disturbance, they may leave right away. So an owl arriving on the colony, they're gone that evening. With other more low-level disturbances, what you find is a gradual reduction in numbers, increased flightiness around the island, decreased productivity, and eventual abandonment of the site. So we may not see the result … for two, three, four, five years, but it is my professional opinion at this point that increased human activity in that region will have a profound effect on the birds nesting in this area.

[¶ 21] In addition to Anderson's testimony, the Board relied on the testimony of Steve Pelletier, a certified wildlife biologist from Topsham. Pelletier personally observed the site of the proposed dock on a number of occasions and had the opportunity to view both the tern nesting site and the seals. He indicated that the tern nesting site is approximately 1500 to 1700 feet from the site of the proposed dock. Pelletier testified that the area is unique in that "it's got a deep water portion, … some shallow water portions, … good flows around some of the islands, … a relatively undisturbed shoreline, … [and] a series of ledges that are exposed at different times of the tides, [one of which] has a grass community growing on it." According to Pelletier, these features both attract and support terns and seals. Pelletier testified that on one occasion, he observed approxi-

mately forty-five birds in the area of the proposed dock, and that the terns' behavior led Pelletier to believe they were nesting. Upon closer examination, Pelletier testified that, although it was early in the season, he saw twenty-two nests, most of which contained an egg. In addition to the Common Tern, Pelletier testified that he observed a Roseate Tern in the area.

[¶ 22] According to Pelletier, terns are "susceptible to disturbances, . . . and boating traffic is one of those disturbances." Pelletier indicated that when disturbed by humans in close proximity to their nesting areas, terns will typically leave their nests, making their eggs easy prey for predators. Pelletier testified that the distance from which nesting terns could be disturbed varies from more than a hundred yards to 500 or 600 meters. According to Pelletier, the proposed dock, its use, and the potential changes in the use of the dock over time would cause a gradual, but significant decrease in tern population. Although Pelletier considered the structure of the dock itself to be benign, he indicated that the potential boat traffic in and around the dock would be likely to have a devastating impact on the tern population.

[¶ 23] Leslie Cowperthwaite, founder and Director or Maine Seal, did not testify at the hearing, but submitted a letter in opposition to the proposed dock. Cowperthwaite indicated that "[t]he tidal ledges, shorelines, and waters of *Indian Point, Milliken's islands, Green Island,* and *Black Island* in Western Bay are the home of the largest pupping colony of harbor seals . . . in Maine, as well as along the entire eastern seaboard of the United States." According to Cowperthwaite, the area is "the home of the greatest number of adult female harbor seals giving birth each spring—approximately 300 seals present in May and June [and] holds an unusually large congregation of harbor

seals throughout the spring, summer, and fall—up to 450 seals during the summer months."

[¶ 24] Cowperthwaite indicated that the harbor seals that inhabited Indian Point and Green Island, located in the area surrounding the Hannum property, have been pushed further inland (even closer to Hannum's property) to the ledges around Milliken's Islands and Indian Point. According to Cowperthwaite, this migration is due to "the cumulative effect of increased boating activity in the channel between Black Island and Green Island, and other human-related activities such as development and associated noise." Thus, she indicated that the dock would have many detrimental impacts on the harbor seals in the area, including, "seals fleeing into the water from boat disruptions; seal pups becoming separated from their mothers; less nursing time for infant seals; additional stress on all individual seals; altered behavior of individual seals and the whole colony; and displacing seals from their habitual pupping and haul-out sites." She stated, "[i]f built, the Hannum dock would intrude into the middle of the harbor seal colony. Boats leaving from, and returning to, the dock would disrupt seals that are hauled out on land as well as those floating and swimming in the water."

[¶ 25] Hannum's own expert, Dr. John Gilbert, testified that the site of her proposed dock was also the site of a significant colony of seals. To limit the risk of disturbance to the seals during their pupping season, Gilbert recommended that the dock not be built during May or June. Gilbert's ultimate determination that no lasting harm would result from Hannum's dock was based on the assumption that the dock would only be used two to three times a week for a period of sixty to ninety days during the summer months.

[¶ 26] The Board ultimately credited the opinions of Anderson, Pelletier, and Cowperthwaite over Gilbert's testimony. Although several national and state organizations approved of or supported the project, and although some witness testimony supported the conclusion that no harm would result from Hannum's proposed dock, the Board chose to credit the testimony and documentation of Anderson, Pelletier, and Cowperthwaite. The Board properly performed its fact-finding function when it weighed the evidence presented and determined that Hannum's dock, and the boating that would result from the dock's use, would cause harm to the seals and terns in the cove. Sufficient evidence exists in the record to support the Board's findings, and no evidence exists that leads us to believe the Board acted in an unfair or unreasonable manner in reaching its conclusion.[4] Accordingly, we affirm the Board's decision denying Hannum's application.

The entry is:

Judgment of the Superior Court vacated and remanded for the entry of a judgment affirming the Board's decision.

ALEXANDER, J., with whom, DANA, J. joins, dissenting.

[¶ 27] I respectfully dissent. After careful consideration of the extensive record in this case, the Superior Court vacated the decision of the Board of Environmental Protection. In its conclusion, the Superior Court stated:

The potential use of the dock by Hannum and her family and the impact it will have upon Long Cove is speculative.

Once again a finding that the dock in question would result in increased boat traffic and therefore result in damage to aquatic life and habitat requires "reasonable extrapolation" from present facts. BEP's finding in this case suffers from the same short comings that were discussed in *Hannum v. Board of Environmental Protection*, 832 A.2d 765 (Me. 2003). The *Hannum* court in its decision stated the following:

Although the Board could reasonably conclude that the Hannum dock itself would generate additional boat traffic, there was no evidence that the granting of this permit would reasonably be anticipated to result in the building of more docks. At 770.

Even the *Hannum* court found that the BEP could reasonably conclude that the dock would result in additional boat traffic; however, it did not sustain BEP's decision based on their finding that the Board could, "reasonably conclude" that the dock would generate additional boat traffic. The record fails to make the connection between the additional boat traffic from the Hannum dock and the harm to aquatic life and habitat. There is no evidence as to how the increased boat traffic from the Hannum dock would harm aquatic life other than general statements made by the experts presented by the intervenors in this case indicating that any increased boat traffic would harm the aquatic life and habitat.

[¶ 28] I agree with the Superior Court's opinion in this matter. In so doing, I note three matters in particular. First, one

---

4. Relying on *Great Cove Boat Club v. Bureau of Public Lands*, 672 A.2d 91, 95 (Me.1996), Hannum also argues that the denial of her permit application impermissibly eliminates her common law right to wharf out. Contrary to her contention, the right to wharf out is subject to reasonable regulation, which includes a requirement that a landowner acquire a permit prior to erecting a dock. *Id.; Whitmore v. Brown*, 102 Me. 47, 56, 65 A. 516, 520 (1906).

reason that the Board denied the application was its speculative finding that the dock might interfere with the public's viewing of the terns and seals. Increased public viewing of the terns and seals, particularly if that viewing is by boat, would seem to promote the very harm the Board's action purportedly seeks to avoid.

[¶ 29] Second, the principal evidence relied upon by the Board for its finding of harm to the tern colony was presented by an individual who makes it his business to monitor the tern colony by physically invading the colony, scaring the birds off their nests so he can count the eggs therein. This tern monitoring activity would seem to be far more disruptive to the tern colony than occasional boating activities of Hannum and her grandchildren at a dock at least 1400 feet from the colony.

[¶ 30] Third, while Hannum's original application was pending, the Board was engaged in an ultimately successful effort to convince us that most docks on salt water frontage were of so little environmental consequence that permits could be handed out administratively by Department of Environmental Protection staff with no Board review. In *Conservation Law Foundation, Inc. v. Department of Environmental Protection*, 2003 ME 62, 823 A.2d 551, we approved a permit by rule process for salt water docks, noting that "[t]he practical effect of the permit by rule process ... is that the builder of a pier or wharf that meets the standards and requirements of the rule may be granted a permit to construct it without going through an individual application process." [5] *Id.* ¶ 8, 823 A.2d at 556. There appears to be no practical difference between Hannum's proposed dock and the docks that, at the time, the DEP was approving by rule.

[¶ 31] The Board disapproved Hannum's application, based on six-year-old evidence [6] that (1) the "likely harm to aquatic life and the aquatic habitat" was unreasonable; (2) the "likely disturbance to an endangered species" (actually one Roseate tern that observers speculated might be nesting with the Common terns in the summer of 2000) and the "inability of the resource to recover" resulted in "an unreasonable impact on the coastal wetland"; and (3) there would be unreasonable interference "with existing scenic and aesthetic uses pertaining to the viewing of those wildlife species [seals and terns]." The findings of unreasonableness were significantly based on the Board's determination that Hannum had available, reasonable alternatives to achieve the boating uses she desired with the dock.

[¶ 32] The flaws in the Board's findings are quickly apparent. First, in denying approval based on speculation about "likely" future impacts, including speculation about whether, or not, in 2000 one Roseate tern might consider permanently moving in with the "common" tern colony, the Board repeated the error of relying on speculation rather than evidence that led to the remand in *Hannum v. Board of Environmental Protection*, 2003 ME 123, ¶ 15 n. 6, 832 A.2d 765, 769–70. If the record developed in 2000 could not support anything better than the speculative findings in the Board's original order, that same evidence certainly did not get any better when considered on remand several years later.

5. The Department of Environmental Protection may have recently ceased approving new dock construction through the permit by rule process.

6. The record relating to Hannum's application was developed in 2000. On remand the Board took no new evidence and decided the issue based on the evidence in the record from 2000.

[¶ 33] Second, if the Board is correct in its determination that Hannum could reasonably accomplish the boating activities she desired without use of the dock, then there would be little or no net increase in Hannum's boating activities as a result of the dock, and consequently, no adverse environmental impact, because it was the boating activities, not the dock itself, that were speculated to create the environmental impacts.

[¶ 34] Finally, nothing in the Board's findings indicates any objective criteria to support the disparate treatment given Hannum's application compared to the numerous dock construction projects that, at the time and since, were being approved under the permit by rule process.

[¶ 35] In *Kosalka v. Town of Georgetown*, 2000 ME 106, 752 A.2d 183, we reminded land use regulatory agencies that individuals seeking to make improvements to their property "are entitled to know with reasonable clarity what they must do under state or local land use control laws to obtain the permits or approvals they seek." *Id.* ¶ 12, 752 A.2d at 186. We previously struck down an ordinance reliant on a "compatible with existing uses" standard as failing "to articulate the quantitative standards necessary to transform the unmeasured qualities ... into specific criteria objectively usable by both the Board and the applicant." *Wakelin v. Town of Yarmouth*, 523 A.2d 575, 577 (Me.1987).

[¶ 36] As we noted in *Kosalka*, a land use control, to pass the due process test, must answer two questions: (1) "what must an applicant do to obtain a permit," and (2) "under what set of facts should the [Board] grant or deny the application"? 2000 ME 106, ¶ 16, 752 A.2d at 187.

[¶ 37] The Board's standards applied to Hannum's application do not offer answers to either of those questions. Whether something unreasonably interferes with existing scenic and aesthetic uses is a question that can be answered only in the eyes of the beholder. That standard and its application by the Board offer no "quantitative standards necessary to transform the unmeasured qualities ... into specific criteria objectively usable by both the Board and the applicant." *Wakelin*, 523 A.2d at 577. As every dock, every development, will have some scenic impact and some impact on the environment and wildlife in the area, pursuant to the Board's standards, any dock or development can be approved or disapproved purely on the whim of the reviewer, without any objective criteria to guide either the decision-maker or future applicants. The Board's approval criteria provided insufficient notice to Hannum, the Board, the courts, or anyone else of the criteria she had to meet for approval. Denial of her application was improperly based on findings that amounted to subjective speculation about the future, unsupported by any objective facts in the record. This administrative process did not meet due process standards.

[¶ 38] I would affirm the judgment of the Superior Court.