STATE OF MAINE
KENNEBEC, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-21-40

MAINEHEALTH, d/b/a Franklin
Memorial Hospital,

      Petitioner,

v.

JEANNE M. LAMBREW,
Commissioner, State of Maine
Department of Health and Human
Services,

      Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**DECISION AND ORDER**

## INTRODUCTION

In this Rule 80C appeal, Franklin Memorial Hospital (FMH) challenges DHHS's recoupment of funds previously distributed to the hospital. Those funds were paid to FMH as part of a federal incentive payment program designed to encourage adoption of electronic health record technology among Medicaid/Medicare-participating providers. Incentive payments have a Medicaid and Medicare share component. This case involves the Medicaid share, which employs a specified formula for determining the incentive payment amount. One variable in the formula—the number of Acute Medicaid Inpatient Days—is at the center of this appeal.

Following a post-payment audit in 2018, DHHS found fewer Acute Medicaid Inpatient Days than were originally calculated when the incentive payment was first made. The result: The incentive payment amount reduced, and DHHS determined that FMH had been overpaid. After a full administrative hearing, the Hearing Officer determined that DHHS failed to meet its burden of demonstrating it was entitled to recoupment for the amount alleged. The Commissioner, however, disagreed and affirmed DHHS's recoupment determination. On appeal, FMH challenges the Commissioner's conclusions

as well as certain aspects of the audit process, taking issue with the data sources DHHS used to calculate Acute Medicaid Inpatient Days. Among other arguments, FMH also challenges DHHS's authority to conduct the 2018 audit and raises several issues surrounding the calculation of the incentive payment.

## BACKGROUND

**Relevant Legal Context**

This case requires the court to navigate a particularly complex area of law. To place the facts and issues in their proper context, an overview of the relevant legal framework is in order. Specifically, the court briefly reviews the federal program under which the incentive payments were distributed; the State's role within that program; Maine's Health Information Technology Plan and related DHHS rules; how the incentive payments are calculated, and; the MaineCare reimbursement process.

*The HITECH Act*. Enacted in 2009, the federal Health Information Technology for Economic and Clinical Health ("HITECH") Act was designed to encourage the adoption of electronic health record ("EHR") technology by health care providers, including hospitals. A.R. 414. To accomplish such an objective, the Act creates incentive payments for eligible Medicaid/Medicare-participating providers that upgraded to EHR systems. 42 C.F.R. §§ 495.2, 495.4, 4101-02, 4201. Participation in the program is voluntary. A.R. 414.

Under the HITECH Act, states develop the procedures for participation in the EHR incentive program through their existing Medicaid programs, subject to approval by the federal Center for Medicaid and Medicare Services ("CMS"). A.R. 414. The role of a state in the implementation of a Medicaid EHR program is to "determine[] the provider's eligibility for the EHR incentive payment . . . and approve[], process[], and make[] timely payments using a process approved by CMS." 42 C.F.R. § 495.312(c); *see also id.* at §§ 495.316, 495.318. States carry out these functions through a comprehensive state plan—the State Medicaid Health Information Technology Plan ("SMHP")—that CMS must approve. *Id.* § 495.332. The applicable regulations provide that the state plan must include "[a] detailed plan for monitoring, verifying and periodic auditing of the requirements for

2

receiving incentive payments." *Id.* § 495.316(b). States have flexibility in implementing the EHR incentive payment program within federally established parameters. A.R. 414.

*Maine's SMHP and Related Rules*. DHHS submitted a draft SMHP in 2010 that was revised at least twice in light of CMS's comments. CMS approved Maine's SMHP in June 2011, A.R. 415, and it was later revised in 2014. A.R. 1739.

Additionally, in 2011, DHHS promulgated administrative rules under the APA to implement the MaineCare Health Information Technology Program (HIT Program). *See* 10-144 C.M.R. ch. 101, ch. I, § 2; A.R. 415. Those rules were amended through the APA rule-making process in 2014, with the amended rules taking effect in November 2014. A.R. 415. The amendments, *inter alia*, incorporated the SMHP into the MaineCare Benefits Manual. *See* 10-144 C.M.R. ch. 101, ch. I, § 2.01 ("Maine's SMHP, IAPD-U, and OMS rules supplement federal law and rules, as amended, in areas where federal law and rules delegate authority to states"); *Houlton Reg'l Hosp. v. Lambrew*, No. HOUSC-AP-19-01, 2019 Me. Super. LEXIS 96, *13 n.3 (Sept. 3, 2019).

*The Incentive Payment*. The HITECH Act establishes a formula for calculating the incentive payment amount. Formulas are used to calculate the Medicaid and Medicare shares of the incentive payment. This appeal concerns the Medicaid share.

Generally speaking, the size of a hospital's incentive payment is linked to the size of the Medicaid population the hospital serves; if the provider serves a greater volume of Medicaid patients, the hospital will receive more money. To that end, the HITECH Act utilizes a fraction, which divides a hospital's volume of acute-care inpatient bed days attributable to Medicaid patients (the numerator) by the volume of inpatient bed days overall (the denominator). This appeal is primarily concerned with numerator of the fraction, i.e., "Acute Medicaid Inpatient Days." R. 417. [1] The larger the numerator, the

---

[1] The terms "inpatient bed days," "acute-care inpatient bed days," "acute days," and other variations are used interchangeably throughout the record to describe the fraction numerator. The court primarily use the term "Acute Medicaid Inpatient Days."

larger the fraction, and the larger the incentive payment.[2] The Hearing Officer described the pertinent fraction as follows:

> The Medicaid Share is equal to the following fraction:
>
> (Numerator) – Sum for a 12 month period of:
>
> - The estimated number of acute-care inpatient-bed-days which are attributable to Medicaid individuals;
>
>   and
>
> - The estimated number of acute-care inpatient-bed-days which are attributable to individuals who are enrolled in a managed care organization, a pre-paid inpatient health plan, or a pre-paid ambulatory health plan under part 438 of this chapter
>
> _____
>
> (Denominator) – Product of:
>
> - The estimated total number of acute-care inpatient-bed-days with respect to the eligible hospital during such period;
>
>   and
>
> - The estimated total amount of the eligible hospital's charges during such period, not including any charges that are attributable to charity care, divided by the estimated total amount of the hospital's charges during such period.
>
> In computing acute-care inpatient-bed-days within the numerator of the fraction, a State may not include estimated acute-care inpatient-bed-days attributable to individuals with respect to whom payment may be made under Medicare Part A, or acute-care inpatient-bed-days attributable to individuals who are enrolled with a Medicare Advantage organization under Medicare Part C. *See*, 42 C.F.R. §495.310(g)(2).

---

[2] For a more complete description of the incentive payment formula, *see* A.R. 416-17.

Another layer of this case involves the data sources that may be used to calculate Acute Medicaid Inpatient Days. Neither the HITECH Act nor CMS impose a mandate as to which data sources should be used for this purpose. *See* A.R. 414. Instead, states are afforded discretion to choose the best sources for their respective programs. *See id.* In the preamble to the applicable regulations, CMS stated that "there are a number of data sources available that would allow States to accurately [capture] data for the purposes of calculating the Medicaid Share." 75 Fed. Reg. 44314, 44501 (July 28, 2010); A.R. 1006. CMS went on to list specific examples such as "Medicare cost reports, Medicaid cost reports, MMIS data, hospital financial statements, and accounting records" as reasonable choices. *Id.* Moreover CMS made clear that "States must describe their auditable data sources in their SMHP and submit to CMS for review and approval." 75 Fed. Reg. 44314, 44450; A.R. 1005. In its SMHP, Maine specified that "[f]or hospitals, Medicare cost reports will be used to verify the Medicaid patient volumes, and to calculate the payment amounts." A.R. 415, 1695-96.

*Medicare Cost Reports.* Hospitals file Medicare cost reports with the federal government, and the state receives a copy as well. A.R. 570. Apparently, the report consists of an itemization of costs for different areas of the hospital and includes a figure for Acute Medicaid Inpatient Days. A.R. 570. This figure includes the number of bed days actually paid by Medicaid as well as unpaid days that are otherwise Medicaid eligible. A.R. 494, 1005. Certain categories of days that must be excluded from the Medicaid share calculation (e.g., nursery days, CHIP days, psychiatric unit bed days, etc.) are not discernable on the basis of the Medicaid cost report alone. A.R. 420.

*MaineCare & MaineCare Reimbursement.* In Maine, DHHS administers the Medicaid program, and Maine's Medicaid program is known as MaineCare. *Doane v. HHS*, 2017 ME 193, ¶¶ 18, 20, 170 A.3d 269.

DHHS reimburses hospitals through a cost report and settlement process pursuant to the MaineCare Benefits Manual, Chapter III, Section 45. A.R. 418. The Law Court has described this three-step process as follows:

> First, prior to a particular fiscal year, DHHS estimates the total amount of Medicaid reimbursement a hospital will be owed for the fiscal year. DHHS pays that amount throughout the year in weekly interim payments. Second, at the close of the hospital's fiscal year, DHHS issues a MaineCare Interim Settlement based on cost data in the hospital's as-filed (but un-audited) Medicare cost report. Third, DHHS issues a MaineCare Final Settlement after it receives both the Notice of Program Reimbursement and the audited Medicare cost report from Medicare.

*H.D. Goodall Hosp. v. HHS*, 2008 ME 105, ¶ 3, 951 A.2d 828.

As part of the settlement process, MaineCare evidently tracks the Acute Medicaid Inpatient Days that have actually been paid by the MaineCare program. A.R. 491-95, 2306. The number of MaineCare/Medicaid-paid days appears in the MaineCare Final Settlement. A.R. 2306.[3]

Facts

During the relevant time period (FYE June 30, 2010 and the 3 prior fiscal years), FMH was licensed as an acute care non-critical hospital. A.R. 418. Not long after the incentive payment program came online, DHHS determined that FMH was one of 36 non-psychiatric hospitals eligible for Medicaid EHR incentive payments. A.R. 418. Using the 2010 fiscal year for its base year, DHHS calculated the hospital's EHR incentive amount as $1,548,684, which was to be paid over a period of three (3) years. A.R. 418, 571, 1097-

---

[3] With respect to the data sources used to calculate the final settlement figures, the MaineCare Benefits manual specifies that DHHS will use charges from the MaineCare paid claims history and the hospital's Medicare Final Cost Report, *inter alia*. 10-144 C.M.R. ch. 101, ch. III, §§ 45.03-4, 45.03-5; *see also* A.R. 2335. The MaineCare paid claims history is a state-compiled "summary of all claims billed by the hospital to MaineCare for MaineCare eligible members that have been processed and accepted for payment by MaineCare." 10-144 C.M.R. ch. 101, ch. III, § 45.01; *see also* A.R. 2325. Thus, MaineCare has its own database from which it can draw information regarding paid claims.

99. DHHS's initial incentive payment calculation identified 2,436 Acute Medicaid Inpatient Days. A.R. 1098.

As states are required to perform post-payment audits of the EHR incentive payments and return any overpayments to the federal government, DHHS initiated a post-payment audit of FMH's incentive payment in 2012. A.R. 419. As a result of this audit, the hospital's EHR incentive payment was increased to $1,552,906. A.R. 419, 1108-10. Once again, DHHS found 2,436 Acute Medicaid Inpatient Days. A.R. 1109.

FMH received incentive payments during November 2011, May 2012, and December 2013. A.R. 419. In 2015, Patricia Chubbuck—a manager of the EHR program—became concerned about the potential for an adverse review by the Office of the Inspector General (OIG). A.R. 419. In 12 of the 14 states audited, OIG found deficiencies in the incentive payment calculations. A.R. 419. The deficiencies were evidently found in the payments of states that had relied solely upon Medicare cost reports to calculate Medicaid patient volumes. A.R. 419. Accordingly, DHHS engaged the accounting firm of Myers and Stauffer to perform audits of all 36 Maine hospitals that received incentive payments. A.R. 419.

Myers and Stauffer conducted its audits of the Maine hospitals with the same methodology it used for audits of hospitals in other states, i.e., requesting claims information. A.R. 420. The accounting firm sought such claims-level records because CMS guidance and federal regulations require that auditors include and/or exclude certain data elements from the Medicaid share calculation (e.g., nursery days, CHIP days, psychiatric unit bed days, etc.). A.R. 420. Those elements are not discernable on the basis of the Medicare cost report alone. A.R. 420.

On January 31, 2018, Myers and Stauffer notified FMH that it had been selected for a desk audit. Myers and Stauffer requested that FMH provide a significant amount of claims data related to fiscal years ending June 30, 2007, 2008, 2009, and 2010. A.R. 420.

During the audited timeframe (2007-2010), FMH used DHHS's MeCMS system to process claims. A.R. 418. As part of this process, FMH would submit a claim to MeCMS,

7

which would then issue a remittance advice. FMH would subsequently enter the remittance advice into its patient accounts. A.R. 418. The MeCMS system, however, often incorrectly denied claims and otherwise processed claims inaccurately. A.R. 418. In the words of former DHHS Commissioner Harvey, the MeCMS system was "a worst nightmare realized." A.R. 418. Indeed, the Department took 8 years to issue the final cost settlement for FMH's 2010 fiscal year due to all the "glitches" in the MeCMS system—a process that normally takes only one year. A.R. 418. The 2010 MaineCare Final Settlement acknowledged that "manual adjustments to MeCMS data were made as a result of the termination of the MeCMS system.," A.R. 2302, and calculated a total of 2,179 paid Acute Medicaid Inpatient Days. A.R. 492, 2301-18.

On February 26, 2018, FMH submitted the requested information to Myers and Stauffer. FMH subsequently continued to supplement the information through July 2018. A.R. 420. At the conclusion of its audit, Myers and Stauffer determined that FMH received overpayments as part of the EHR incentive program. A.R. 420. In conducting the audit, Myers and Stauffer relied solely upon the records supplied by the hospital; they did not review records held by the state in the MaineCare paid claims history or otherwise. *See, e.g.*, A.R. 545-46, 2412.

On October 22, 2018, the Department issued a notice of debt to FMH demanding repayment in the amount of $655,120.30. A.R. 420. The notice stated that the downward adjustment to the incentive payment was necessary because: (1) the adjusted number of discharges utilized in the average growth rate calculation was less than the number utilized in the original calculation; (2) The adjusted number of total Acute Medicaid Days was less than the number utilized in the original calculation; (3) The adjusted number of total acute hospital days was less than the number utilized in the original calculation; (4) The adjusted amount of total hospital charges was less than the amount used in the original calculation, and; (5) The adjusted amount of charity care charges was less than the amount used in the original calculation. A.R. 420-21.

FMH then requested an informal review of the audit's findings. On August 27, 2019,

DHHS issued its Final Informal Review Decision, which upheld the Myers and Stauffer's findings. A.R. 421.[4] FMH requested an administrative hearing. A.R. 421.

On March 8-9, 2021, a hearing was held before Hearing Officer Tamra Longanecker. Numerous exhibits were received into evidence and multiple witnesses testified. For witnesses, DHHS called Patricia Chubbuck (a contractor who runs program operations for the Maine Medicaid EHR program) and Regan McTier (a manager at Myers and Stauffer). FMH, meanwhile, presented the testimony of Natasha Erb, the hospital's Senior Director of Finance.[5]

During the proceedings, FMH raised multiple arguments. Among these arguments, FMH challenged DHHS's authority to use claims information as a data source in conducting the audit as opposed to the Medicare cost reports referred to in Maine's SMHP. It further argued that DHHS was without authority to conduct the Myers and Stauffer audit in the first place. Additionally, FMH took issue with Myers and Stauffer's calculation of total Acute Medicaid Inpatient Days and contended that certain categories of days were erroneously excluded from this total. FMH also challenged how the audit was performed, including Myers and Stauffer's failure to reconcile its findings with those previously made by MaineCare.

Ultimately, the Hearing Officer determined that DHHS had the authority to conduct the audit using documentation other than the Medicare cost report. She concluded, however, that DHHS failed to prove by a preponderance of the evidence "that its revised EHR incentive payment calculation (based solely on claims information) was correct."

---

[4] During the hearing, the Department conceded that it improperly calculated the so-called "CHIP factor," a proxy percentage used to estimate CHIP program days and remove them from the numerator of the Medicaid incentive payment calculation. After the conclusion of the testimonial portion of the hearing, the Department submitted a revised CHIP factor that reduced the alleged overpayment from $655,120.30 to $634,992.72. A.R. 1600-10.

[5] Due to problems with the recording of Ms. Erb's testimony, FMH (with DHHS's approval) submitted a written summary of the missing portion of the testimony. A.R. 814-15; 763-68.

A.R. 434-35. Among other reasons, the Hearing Officer was persuaded by FMH's arguments regarding the disparity between the total number of paid Acute Medicaid Inpatient Days found by MaineCare in the 2010 MaineCare Final Settlement (2,179) and the number found by Myers and Stauffer in the 2018 post-payment audit (1,486). A.R. 433-34. Moreover, the Hearing Officer was concerned that the claims information in the hospital's records—the sole data source upon which Myers and Stauffer relied—was drawn directly from the unreliable MeCMS system. *Id.* Thus, the Hearing Officer recommended that the Commissioner find as follows: (1) "The Department was permitted to conduct a post-payment audit using documentation other than the Medicare cost report," and; (2) "The Department was *not* correct when it determined that Franklin Memorial Hospital received an overpayment for the EHR program in the sum of $634,992.72." A.R. 422.

On October 22, 2022, the Commissioner issued a Final Decision in which she accepted the Hearing Officer's first recommendation, but rejected the second recommendation, concluding that DHHS correctly sought recoupment. A.R. 1-2. Additionally, the Commissioner accepted all but 2 of the Hearing Officer's factual findings and made certain factual findings of her own. With respect to Myers and Stauffer's calculation of Acute Medicaid Days, the Commissioner adopted the "reasons set forth by the Hearing Officer in her recommended decision" and concluded that "the total number of Acute Medicaid Days and Acute Medicaid Days [sic] used in the post-payment audit calculation was correct."

FMH timely appealed the Commissioner's final decision.

## STANDARD OF REVIEW

The Law Court has frequently reaffirmed the principle that judicial review of administrative agency decisions is "deferential and limited." *Passadumkeag Mountain Friends v. Bd. of Envtl. Prot.*, 2014 ME 116, ¶ 12, 102 A.3d 1181 (quoting *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128). The court is not permitted to overturn an agency's decision "unless it: violates the Constitution or statutes;

10

exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or error of law; or is unsupported by the evidence in the record." *Kroger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 7, 870 A.2d 566. The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v. Me. Pub. Emp. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501.

## DISCUSSION

Among its numerous arguments on appeal, FMH takes issue with (1) the Commissioner's determination that the total number of Acute Medicaid Inpatient Days used in Myers and Stauffer's 2018 audit was correct, and (2) Myers and Stauffer's failure to consider DHHS's records as part of that audit. For the reasons described below, the court finds these arguments persuasive. While the court's disposition of this appeal renders it unnecessary to reach all of FMH's issues, the court nevertheless addresses the following issues as well: whether DHHS was required to use Medicare cost reports to calculate Acute Medicaid Inpatient Days; whether DHHS had the authority to conduct the 2018 audit, and; whether DHHS erred by failing to count Medicaid eligible (but unpaid) days in the incentive payment audit.

1. **The Commissioner's determination that the total number of Acute Medicaid Inpatient Days used in Myers and Stauffer's 2018 audit was correct.**

The total number of Acute Medicaid Inpatient Days was a source of considerable dispute during the agency proceedings below. The Commissioner ultimately determined that the figure calculated by Myers and Stauffer was accurate. Specifically, she stated: "For the reasons set forth by the Hearing Officer in her recommended decision, the total number of Acute Medicaid Days and Acute Medicaid Days [sic] used in the post-payment audit calculation was correct."

FMH argues that the Commissioner's determination is "both arbitrary, and not supported by substantial evidence in the record," observing that it is "contradicted by the plain language of the [Hearing Officer's] Recommended Decision." Pet.'s Br. at 44-45. The court agrees that the Commissioner's determination regarding Acute Medicaid

11

Inpatient Days —which was based on the "reasons set forth by the Hearing Officer"—cannot be reconciled with the Hearing Officer's recommended decision.

In Section C and E of her recommended decision, the Hearing Officer addressed FMH's contention that Myers and Stauffer failed to properly identify the total number of Acute Medicaid Inpatient Days. *See* A.R. 431-35. And she was ultimately "persuaded by FMH's arguments that the Department failed to prove by a preponderance of the evidence that its revised payment calculation [wa]s correct." A.R. 433. While perhaps the Hearing Officer could have stated her underlying reasoning with better clarity, it is evident to the court that the Hearing Officer's decision was motivated by two primary concerns.

First, she was concerned that Myers and Stauffer's calculation of Acute Medicaid Inpatient Days was derived solely from the hospital's records—the original source of which was the notoriously unreliable MeCMS system. Moreover, Myers and Stauffer failed to look beyond those records to verify whether a Medicaid payment was actually made with respect to the days they opted to exclude. *See* A.R. 433-34.

Second, the Hearing Officer was troubled that Myers and Stauffer's findings regarding Acute Medicaid Inpatient Days could not be reconciled with the prior audit findings of MaineCare. Notably, a disparity of 693 days existed between the total number of paid Acute Medicaid Inpatient Days found by MaineCare in the 2010 MaineCare Final Settlement and the number found by Myers and Stauffer in the 2018 post-payment audit. A.R. 433-34.

Thus, it is apparent to the court that the Hearing Officer did *not* find that the total number of Acute Medicaid Days used in the post-payment audit calculation was correct. Yet, the Commissioner came to the opposite conclusion—despite having expressly adopted the reasoning of the Hearing Officer and most of the Hearing Officer's findings. The issue, then, is whether the Commissioner, having adopted the Hearing Officer's determination regarding the accuracy of the Acute Medicaid Day calculation, reached a conclusion that was reasonable, just, and lawful. *See Maine Care Servs. v. Department*

*of Human Servs.*, No. AP-00-076, 2001 Me. Super. LEXIS 116, *8 (September 12, 2001). The court concludes it did not.

Addressing a similar situation, one Superior Court Justice accurately observed: "The Commissioner was not required to adopt the Hearing Officer's findings. Adopting those findings, however, preclude[d] a review of the record to make findings and conclusions inconsistent with the Hearing Officer's findings." *Id.* at *9. In other words, the Commissioner's "conclusions cannot . . . be inconsistent with the adopted findings, which are supported by the evidence in the record." *Id.*

Here, the Hearing Officer's findings and the Commissioner's conclusions based on those findings cannot be reconciled. While the Commissioner concluded that Myers and Stauffer's calculation of Medicaid Acute Days was accurate, that conclusion cannot be sustained by the Hearing Officer's recommended decision. Indeed, the Hearing Officer found that DHHS *failed* to meet its burden of showing that Myers and Stauffer's payment calculation—including its calculation of Acute Medicaid Inpatient Days—was correct. Because the conclusion reached by the Commissioner is inconsistent with the findings and reasoning she adopted, the court finds her conclusion to be unsupported by the record.

## 2. Myers and Stauffer's failure to consider DHHS's records.

FMH further takes issue with the 2018 audit on the grounds that it was based solely on FMH's records. *E.g.*, Pet.'s Br. at 39. FMH argues that Myers and Stauffer did not review DHHS's own records and data regarding paid Acute Medicaid Inpatient Days—an omission FMH says constitutes a departure from the audit procedures contemplated in the SMHP. *See* Pet.'s Br. at 39 n.31 & Pet.'s Reply at 7-11.

The SMHP sets forth the State's strategy for auditing incentive payments. As the SMHP was promulgated as a rule in 2014, *see Houlton Reg'l Hosp.*, 2019 Me. Super. LEXIS 96, **13 n.3, 20; 10-144 C.M.R. ch. 101, ch. I, § 2.01, it follows that post-payment audits need to be conducted in accordance with the audit strategy set forth therein. A.R. 541.

13

A summary of the State's audit strategy is outlined in Section D, Part 4 of the SMHP. *See* A.R. 1746-47. There, the SMHP identifies the data sources auditors are to rely upon and provides a general overview of the various steps in the audit process. As one of the "Resources/Data Sources," the SMHP identifies "MIHMS"—the State system that houses the State's data regarding claims paid by MaineCare.[6]

Moreover, Appendix D-5 provides additional detail regarding the various steps in the audit process. *See* A.R. 1965-68. While Appendix D-5 contemplates that data may be requested directly from hospitals, *see* A.R. 1966, it also specifies that data will be pulled from State data systems. A.R. 1965. Indeed, step "AUD-040-030" in the process reads as follows:

AUD-040-030: Extract payment data from data sources

| Description: | Description: Audit extracts data from State systems and data sources to complete the audit on incentive payments.<br><br>Resource: Audit/MaineCare Services<br><br>Proposed Technology to leverage: OIT Developed HIT System and other existing systems, MIHMS, AdvantageME |
| --- | --- |

A.R. 1965.

Thus, the State's strategy for auditing incentive payments is two-pronged: It involves (1) reviewing data held by the State and (2) reviewing records kept by the hospital. Such a two-pronged strategy makes sense from an accuracy standpoint as it provides multiple sources from which data may be verified, cross-checked, and reconciled.

The Myers and Stauffer audit, however, relied solely upon FMH's own records. As such, it did not review MaineCare's prior findings regarding paid Medicaid Inpatient Days or reconcile the hospital's data with the information maintained by the State. The failure to

---

[6] *See* A.R.1633 ("MIHMS is an integrated system that supports claims processing, provider enrollment, care management, program integrity, information management, and case management"); A.R.1644 ("The primary functions of MIHMS are getting and adjudicating claims; providing the data for reporting, analysis, and payment; and all activities having the necessary level of auditing and security to maintain the integrity of the process and system.").

obtain and consider DHHS's own records as part of the audit process constituted a deviation from the audit strategy contemplated in the SMHP.

### 3. Whether DHHS was required to use Medicare cost reports to calculate Acute Medicaid Inpatient Days.

FMH argues that the SMHP identifies Medicare cost reports as the data source for ascertaining Acute Medicaid Inpatient Days. Therefore, FMH contends, DHHS's post-payment audit was limited to the information set forth in the Medicare cost report. *See generally* Pet.'s Br. at 28-33.

This argument fails for the simple reason that such a limitation does not apply in the audit context. In its SMHP, Maine specified that "[f]or hospitals, Medicare cost reports will be used to verify the Medicaid patient volumes, and to calculate the payment amounts." A.R. 1695-96. But it did so in the context of outlining how it would calculate the *initial* payment. *See* A.R. 1694 (providing a high-level overview of the initial payment process). The SMHP does not specify Medicare cost reports as the sole source from which *post-payment auditors* must draw data. For good reason, too. As both the Commissioner and Hearing Officer found, there are certain data elements that must be excluded from the Medicaid share calculation (e.g., unpaid days) that are "not discernable using only Medicare cost reports." Thus, DHHS's examination of data sources beyond the Medicare cost report was appropriate.

### 4. Whether DHHS had the authority to conduct the 2018 audit.

FMH further challenges DHHS's general authority to conduct the audit. Specifically, FMH argues that DHHS lacked the authority to conduct a second post-payment audit. Pet.'s Br. at 27. Moreover, it asserts that DHHS's post-payment audit authority is limited to hospitals participating only in the Medicaid incentive program. FMH, however, participated in both the Medicaid *and* Medicare incentive program.

Chapter 1 of the MaineCare Benefits Manual broadly states that the Division of Audit or its duly authorized agents "have the authority to monitor payments to any MaineCare provider by an audit or post-payment review." 10-144 C.M.R. ch. 101, ch. 1, §

1.16; A.R. 351. In addition, the Federal Register provides in relevant part: "CMS approval of the State Medicaid HIT plan does not relieve the State of its responsibilities to comply with changes in Federal laws and regulations and to ensure that claims for Federal funding are consistent with all applicable requirements." R. 1020. It follows from these authorities that DHHS enjoyed the authority to initiate a second post-payment audit, particularly where taxpayer money was at stake and questions were raised regarding the accuracy of the original calculation.

FMH further maintains that DHHS's audit authority does not extend to hospitals that are dually eligible for Medicaid and Medicare EHR incentive payments. It does not appear that FMH raised this argument during the informal review proceedings or at the administrative hearing stage. Although FMH addressed the issue in its objection to the Hearing Officer's recommended decision, its post-hearing challenges were not timely presented. The issue is therefore unpreserved. *Brown v. Town of Starks*, 2015 ME 47, ¶ 6, 114 A.3d 1003 ("In order to preserve an issue for appellate review, a party must timely present that issue to the original tribunal; otherwise, the issue is deemed waived."); *New England Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife*, 550 A.2d 56, 58 (Me. 1988) ("Generally, plaintiffs in a Rule 80C proceeding for review of final agency action are expected to raise any objections they have before the agency in order to preserve these issues for appeal."); *see also* R. 370 (10-144 C.M.R. ch. 101, ch. I, § 1.21) ("Subsequent appeal proceedings will be limited only to those issues raised during the informal review process.").

## 5. Whether DHHS erred by failing to count Medicaid eligible (but unpaid) days in the incentive payment audit.

FMH maintains that a bed day should be counted as an Acute Medicaid Inpatient Day (a.k.a. "inpatient-bed day") if a patient was generally eligible for Medicaid, regardless of whether Medicaid actually paid the hospital for the services provided. This position is contrary to CMS's interpretation.

On July 28, 2010, CMS issued a series of comments and responses related to its final rule implementing the HITECH Act. *See* A.R. 818-1093. In those comments, CMS

16

addressed how inpatient-bed days should be calculated, in particular whether unpaid bed days should be included in the "inpatient-bed day" calculation. CMS stated: "[T]he EHR incentive payment calculation requires only paid inpatient-bed days." A.R. 1005. Moreover, in an email dated October 24, 2012, CMS explained, "Zero pay Medicaid eligible days must continue to be excluded from the Medicaid hospital incentive calculation." R. 1611.

The court concludes that DHHS is bound by this interpretation. The HITECH Act makes clear that "inpatient-bed day" is a term with a meaning to be "established by the Secretary" of Health and Human Services, which oversees CMS. 42 U.S.C. § 1396b(t)(5)(C). CMS has established a definition of "inpatient-bed days" in its interpretation of the HITECH Act. DHHS, meanwhile, is a state actor charged with implementing but not interpreting the federal statute. 42 C.F.R. § 495.312(c). At bottom, then, FMH's primary disagreement is with CMS's interpretation of a federal provision. As DHHS has no authority to override CMS's interpretation of "inpatient-bed days," it cannot be faulted for following federal directives in this area.

## CONCLUSION

The entry is:

The Decision of the Commissioner is VACATED. The Case is REMANDED to the Commissioner of the Department of Human Services for further proceedings, findings of fact or conclusions of law consistent with this Decision.

The clerk is directed to incorporate this Order into the docket of this case by notation reference in accordance with M.R. Civ. P. 79(a).

Dated: October 12, 2022

Entered on the docket 10/12/22

William R. Stokes
Justice, Superior Court

17